## No. 11,958.

### Meek *v.* City of Loveland, et al.

Decided March 18, 1929.

Mr. John T. Bottom, for plaintiff in error.

Mr. REID WILLIAMS, Mr. PAUL W. LEE, Mr. GEORGE H. SHAW, Mr. WM. A. BRYANS, III, Messrs. GILLETTE & CLARK, Mr. LEROY J. WILLIAMS, Mr. THOMAS Y. BRADSHAW, for defendants in error.

*En Banc.*

MR. JUSTICE BUTLER delivered the opinion of the court.

FRANK D. Meek brought this action for damages against the city of Loveland; George W. Foster, its mayor; Ross E. Wright, its city physician; James M. Williamson, its chief of police; Albert E. Snook, one of its police officers; and T. C. Taylor, the county physician of Larimer county. Before the trial Foster and Snook died, and the case was dismissed as to them.

At the county poor farm, or hospital, defendant Taylor amputated the plaintiff's left leg about 9 inches above the knee. The plaintiff alleges that the operation was negligently performed, and that the plaintiff was negligently treated by defendant Taylor after the operation. The plaintiff alleges that the defendants conspired "to imprison the plaintiff in the county poor farm upon the pretext that he had violated the law"; that this was done for the purpose of concealing certain acts of the defendants and to protect the city from liability for such acts; and that the negligent amputation was the result of the plaintiff's being so imprisoned. The acts thus sought to be concealed are said to be the wrongful shooting of the plaintiff by Snook, who, it is alleged, was employed by the city as a police officer with knowledge of his unfitness for the position; the incarceration of the plaintiff in a cold, damp, dirty, and unsanitary room in the Loveland city jail; and neglecting the plaintiff both before and after his removal from the jail. For these and other acts and omissions prior to the surgical operation the plaintiff seeks no recovery in the third cause of action;

he alleges them merely for the purpose of showing why the defendants caused the removal of the plaintiff to the county poor farm, or hospital. In his brief plaintiff's counsel says that the gravamen of the offense charged in the complaint is malpractice by the defendant Taylor during the time that Meek was under his charge.

The trial court sustained the city's general demurrer to the complaint and dismissed the case as to the city. The separate general demurrers of the other defendants were overruled. At the trial the plaintiff moved to reinstate the city of Loveland as a defendant, which motion was denied. At the close of the plaintiff's evidence, the court granted a nonsuit as to each defendant remaining in the case.

The plaintiff testified that on the evening of February 5, 1922, he had been drinking; that on his way home, about 9 or 9:30 o'clock, feeling sick at the stomach, he stepped into an alley and threw up; that he was leaning on a ledge that goes across the door of a building; that his "elbow slipped off and went through it; that it was no burglary or anything like that at all"; that the officer came along and stopped him, "hollered at" him, and "wanted to know what"—here the witness was interrupted. He testified further that the officer struck him on the head, that the plaintiff ran, and that the officer shot him in the knee. No criminal charge was filed against the plaintiff until March 30, 1922, the day before he left the county poor farm, or hospital. The charges were burglary, malicious mischief, and possessing intoxicating liquor. He gave his recognizance in each case, but the plaintiff was never brought to trial on any of the charges.

1. The action of the trial court in sustaining the city's demurrer and in refusing to reinstate the city as a defendant was right. Assuming that the removal of the plaintiff to the county poor farm, or hospital, was in pursuance of a conspiracy participated in by its mayor, its

city physician, its chief of police, and one of its police officers, the city cannot be held liable for the damages sustained by the plaintiff by reason of the county physician's malpractice, if any there was.

2. There is no averment or evidence that the defendants other than defendant Taylor were actually present, participating in the surgical operation. To charge them, the plaintiff relies upon the following facts disclosed by the evidence: The plaintiff was taken from the jail to the city hospital, where defendant Wright removed the bullet from the leg. The plaintiff was then taken to his home. He testified that a few days later, "Dr. Wright and Chief Williamson came and told me that the sheriff was out there and that I had to go. My mother and brother were there at the time, but I did not see any sheriff or deputy. I argued with them for quite a while because I wanted to go to the hospital at Loveland, but they said I couldn't do that, but I got to go with them, and Dr. Wright spoke up, and he says, 'I won't treat you and I don't know anybody in town that will treat you.' I says, 'I don't want to go to the hospital at Collins, I want Dr. McFadden to doctor me,' and he says, 'He won't treat you.' Dr. Wright said I couldn't go to the Loveland hospital, and that nobody there would treat me. Chief Williamson was present. My mother spoke up and said that we had the money to pay our own doctor bill and that I ought to be able to go where I wanted to. Dr. Wright said that if she wanted to pay any money she could give it to them at the county poor farm. Dr. Wright and Chief Williamson said if I didn't get on the stretcher then, they were going to put me on it. I wouldn't get on the stretcher. Dr. Wright and Chief Williamson put me on the stretcher. I do not remember whether the man from the poor farm helped or not. * * * I reached the poor farm about noon."

The plaintiff's mother testified as follows: "I was present the day they took the plaintiff to the county

poor farm. When they said they were going to take him, I asked them if he couldn't stay at home, or else go to the Loveland hospital, and Dr. Wright said, 'No, I won't treat him, nor no other doctor here will treat him.' They took my son from the house on a stretcher. My son objected to being taken to the county hospital, or county poor farm. I objected. I told them I had the money to pay at the city hospital if they would take him there. I said this to Dr. Wright and Mr. Williamson. Dr. Wright said that Dr. Taylor was a good surgeon and they would use an X-ray over there on him; and I said, 'Well, I don't want him to go there any way,' and I said, 'I can pay for it over here; I have got the money and I can pay for it.' Dr. Wright said, 'You can pay over there, too'; and so did Mr. Williamson; and Dr. Wright said, 'Mrs. Meek, I guess I know more about this than you do. I would rather be shot through the lungs.' And Dr. Wright and some other man carried my son out.''

The plaintiff's brother testified: ''I was at my mother's home on the morning they removed the plaintiff to the county poor farm. Mr. Mills of Fort Collins and Chief Williamson and Dr. Wright were there. Chief Williamson said that the plaintiff had to go over to Fort Collins to the hospital as the sheriff was after him. My brother did not want to go. He told them several times that he wanted to go to the Loveland hospital; so did my mother; and I even offered to take him down there myself. Dr. Wright refused to treat him there; he said he wouldn't treat him there, nor would any one else in Loveland. They laid my brother on a stretcher and took him out of the house and out in a truck.''

According to this testimony, which, for the purpose of the present proceeding, we are bound to accept as true, City Physician Wright and Chief of Police Williamson, acting together, assumed custody of the plaintiff, who was seriously wounded, and against whom no criminal charges had been filed, and caused him to be removed

352

forcibly and against the protest of the plaintiff and his mother, from his home to the county poor farm, or hospital, refusing to permit him to be taken to the hospital of his choice, although his brother offered to take him there, and his mother had the money to pay his expenses at that hospital and informed them that she had. Not until the day before he left the county poor farm, or hospital, which was over 7 weeks after the alleged commission of the offenses, were charges filed against the plaintiff, and those charges never were tried. To remain at large he was obliged to, and did, furnish a recognizance in each of the three cases, after which he left the county poor farm, or hospital. When a city physician and a chief of police act in the manner described in the testimony introduced on behalf of the plaintiff, they do so at their peril.

True, the plaintiff, on cross-examination, said: "I don't recollect Dr. Taylor ever forcibly trying to keep me in the hospital. So far as I know, I was not imprisoned any more than the other patients." The meaning of this testimony was for the jury to determine. The jury may or may not believe that a man wounded as seriously as the plaintiff was did not require the application of physical force, even before the amputation of his leg, to restrain him from leaving the county poor farm, or hospital. The average layman, not having before him a law treatise, ordinarily associates the word "imprisonment" with steel bars and bolts, and with turnkeys and prison guards, and does not know that in the absence of these he may be undergoing imprisonment, within the meaning of the law. These statements of the plaintiff should be taken in connection with all the other evidence, and given the weight to which the jury may consider them entitled.

But Wright and Williamson, their counsel contend, could not reasonably have anticipated that the defendant Taylor would be negligent in amputating the plain-

tiff's leg, and in treating the plaintiff after the amputation; that such negligence was not the proximate result of the act of Wright and Williamson in sending the plaintiff to the county poor farm, or hospital; and therefore that they cannot be held liable for such result. In *Reagan v. People,* 49 Colo. 316, 112 Pac. 785, Reagan entered into a conspiracy to rob one Bronk. Reagan was not present at the time of the robbery, in the commission of which his associates killed Bronk. We held that the fact that Reagan did not contemplate or anticipate that, in the robbery of Bronk, his life would be taken, did not relieve Reagan from criminal liability; that he was just as guilty as though he had struck the fatal blow. In the present case, according to the evidence, Wright and Williamson, when they caused the plaintiff to be taken by force to the county poor farm, or hospital, knew that he was seriously wounded, and was to receive medical or surgical treatment at the hands of defendant Taylor; and, as the evidence now stands, we cannot say that the jury would not be warranted in finding that Wright and Williamson knew that an amputation, if not certain, was at least probable. Having taken him into custody; having refused to permit him to be treated at a hospital of his own selection; having caused the plaintiff to be removed by force to the county poor farm, or hospital, thereby subjecting him, against his will, to treatment by the defendant Taylor,—they should not be permitted to avoid liability on the theory that they cannot reasonably be held to have anticipated that, in treating the plaintiff, defendant Taylor would act in a negligent manner. The liability of defendants Wright and Williamson does not depend upon the existence of any conspiracy between them and the defendant Taylor. The charge of conspiracy, if unsupported by the evidence, may be considered as surplusage. *Foster v. O'Farrell,* 75 Colo. 170, 225 Pac. 217; 12 C. J. 584.

In sustaining the motions of the defendants Wright and Williamson for a nonsuit, the trial court committed error.

3. The court excluded all offered evidence tending to show negligence on the part of the defendant Taylor in amputating the plaintiff's leg, and in treating the plaintiff after the amputation; holding that the evidence of a conspiracy was not sufficient, and that until a conspiracy was proven such evidence was inadmissible. Counsel for defendant Taylor say: "If this action were against Dr. Taylor alone, for malpractice in the amputation of plaintiff's leg, proper evidence thereof could of course be shown. But where, as in this case, the allegation is of a joint tort as above quoted, such evidence is inadmissible until the tort—the conspiracy—is first proven." The trial court acted upon that theory. The gist of the action is malpractice, not conspiracy. *Foster v. O'Farrell*, 75 Colo. 170, 225 Pac. 217; *Pullen v. Headberg*, 53 Colo. 502, 127 Pac. 954. Accurately speaking, there is no such thing as a civil action for conspiracy. If the defendant Taylor was negligent, as alleged, he is liable. From the fact, if it is a fact, that the evidence was insufficient to show that he was acting pursuant to a conspiracy between him and the defendants Wright and Williamson, the defendant Taylor can derive no advantage. Assuming that he is not liable for their acts, he is liable for his own. Wright and Williamson are liable for the defendant Taylor's negligence, on the theory that the injury suffered by reason thereof was the proximate result of their act in forcibly sending plaintiff to the county poor farm, or hospital, in the circumstances already detailed, and thereby knowingly subjecting him, against his will, to medical and surgical treatment by the defendant Taylor. In these circumstances, there seems to be no sound reason for compelling the plaintiff to bring separate actions; one against defendants Wright and Williamson, and another against defendant Taylor. The circum-

stances justify their joinder in one action. The acts of all three concurred in causing the injury for which the plaintiff seeks to recover damages.

The trial court erred in excluding the offered evidence. It was admissible, not only against the defendant Taylor, but also against the defendants Wright and Williamson. The court also erred in sustaining defendant Taylor's motion for a nonsuit.

The pleadings and the evidence are sufficient to require the submission of the case to the jury upon the theory discussed in this opinion. The so-called first and second causes of action should be dismissed.

4. It is contended that there is no judgment to review; and for this reason the defendants in error move that the writ of error be dismissed. The application was made for the first time in defendant Taylor's brief. Thereafter all the defendants joined in filing such a motion. As the defendants had permitted the plaintiff to incur the expense of having his abstract and brief printed before they filed the motion, they cannot expect an appellate court to view such an application with any extraordinary degree of favor. The abstract recites: "The motions for nonsuit were granted, judgment of nonsuit entered, exceptions were noted  *  *  *." To contradict this statement, counsel for defendant Taylor refer us to the following entry in the transcript: "Thereupon the defendants by their counsel, move for nonsuit, and the court  *  *  *  doth grant said motion. Whereupon the plaintiff excepts, and the defendants *move for judgment for costs,* and the court  *  *  *  *doth grant said motion for judgment for costs."* Common sense suggests that this should be considered as the rendition of a judgment. But any doubt about a judgment having been rendered is dispelled by the following entry, expressly made a part of the record by the certificate of the trial judge: "The motion of the defendants and each of them [for nonsuit] is sustained.  *  *  *  Mr. Clark: We now move on be-

half of the defendants that *judgment of nonsuit be entered,* and costs taxed. Mr. Bryans: We join in the request. The court: *It will be so ordered,* and the exceptions of the plaintiff will be shown.'' It thereupon became the duty of the clerk to enter the judgment so rendered. His failure to do so was the failure to perform a purely ministerial act. When this situation was called to our attention, we ordered that the clerk of the trial court enter, nunc pro tunc, the judgment that had been rendered by the court, and that a certified transcript of the judgment entry be forthwith transmitted to this court. We also ordered that such transcript, when filed, should become a part of the record in the case, unless within a specified time cause should be shown why it should not be made a part thereof. The transcript has been filed with the clerk of this court, the specified time has expired, and no such showing has been made.

The judgment is reversed, and the cause is remanded, with the direction to dismiss the first and second causes of action, and for further proceedings in harmony with the views herein expressed.