. No. 18,365.

CITY AND COUNTY OF DENVER *v*.
RITA GAYLEAN MADISON, ETC.
(351 P. [2d] 826)

Decided January 11, 1960.
On rehearing May 23, 1960, original opinion adhered to.

1

2

Mr. John C. Banks, Mr. Ty R. Williams, for plaintiff in error.

Mr. G. Michael Morris, for defendant in error.

*En Banc.*

Mr. Justice Moore delivered the opinion of the Court.

This is an action for damages for personal injuries. Trial of the case resulted in a verdict in favor of plaintiff for $35,000.00. The City and County of Denver, against whom said judgment was entered, brings the case here for review by writ of error. We will refer to the City and County of Denver as the City or defendant, and to the defendant in error as plaintiff.

The action was commenced April 24, 1956, and the complaint contained allegations that plaintiff was born on July 27, 1946; that no guardian or other fiduciary has ever been appointed by court order to protect the interests of the minor plaintiff; that a notice of the claim against the City was served on April 20, 1956, and that said notice was not served within the time prescribed by

law for the reason that plaintiff was, and is, an infant under a disability; that the Denver General Hospital is operated by the City and County of Denver; that on February 1, 1947, when plaintiff was six months old she was taken to said hospital where a physician employed by the City determined that she was suffering from pneumonia; that she was admitted to said hospital for observation and treatment, and that as a result of the negligence of the City while a patient as aforesaid plaintiff suffered severe burns on her back, buttocks, face and arms; that said burns disfigured and crippled her so that the use of her arms and legs has been permanently impaired and that by reason of said burns she became permanently blind, deaf, mute and an idiot.

Defendant filed a motion to dismiss on the ground that the complaint failed to state a claim upon which relief could be granted for the reason that the Denver General Hospital and its employees were at all pertinent times engaged in a governmental function and therefore as a matter of law the City could not be held liable. As a further ground for said motion the City alleged that the failure to give written notice of claim within the time required by law should defeat the action. The motion to dismiss was overruled and the City filed an answer denying negligence on its part, and generally placing in issue all material allegations of the complaint.

As a separate defense the City alleged that it was immune from liability because the employees of the City whose acts allegedly caused the injuries to plaintiff were performing services in connection with a governmental function of the City and County of Denver. Additional defenses alleged by the City were that the disabilities suffered by plaintiff were caused by congenital conditions existing at the time of her birth, improper prenatal care of the mother and child, and improper care and treatment at the time of and subsequent to plaintiff's birth; that the statute of limitations, C.R.S. 1953, 139-35-1, barred recovery; and that the injuries and

damages sustained were caused by an unavoidable accident.

The parties stipulated concerning many of the pertinent facts, and the record establishes without dispute that plaintiff was admitted to the Denver General Hospital on February 1, 1946, where she was treated for pneumonia; that on February 7, while she was strapped in her bed part of her treatment consisted of the use of a steam vaporizer; that while thus being treated she was very seriously burned from steam or hot water, or both. The hospital record relating to the tragic incident, as recorded by the nurse who first discovered what had happened, is as follows:

"Diagnosis Lobar pneumonia. Condition serious. At 1:00 p.m. I came on duty. At 1:00 p.m. report baby's condition was reported improved since entrance into hospital. I went in to give child 2:00 p.m. formula. Around 1:30 child was getting steam inhalations and was restrained securely with double clove hitch. Finding the water container almost empty I filled the container about two thirds full with water leaving the lid to the container ajar so that excess steam could escape. The supervisors made rounds around 3:10 p.m. Found the baby all right. At about 3:25 I returned to the baby to give it water and found child severely burned. Steam droplets were dripping from the spout. I reported to the head nurse immediately. Do not know how accident occurred. Pressure inside of the container must have caused a spray of hot steam which hit the restrained baby at the top of the bed."

The infant plaintiff suffered second and third degree burns on the left foot, left leg, buttocks, three-fourths of the area of the back, the arms, and portions of her face. At the time of trial — March 1957 — plaintiff was deaf, dumb, blind, unable to walk, and was described as an "idiot."

By stipulation of counsel the hospital records containing the case history of plaintiff were admitted in evi-

dence. They disclose that she was first admitted to the hospital July 27, 1946, as a prematurely born child the product of six to seven months gestation, weighing about two pounds two ounces. She developed and was dismissed October 23, 1946, weighing approximately five pounds, having progressed to that point in the normal way that is expected in premature births. She was next admitted to the hospital February 1, 1947, and received the burns complained of on February 7, 1947.

It was further stipulated:

" * * * that the Department of Health and Hospitals, and particularly, the Denver General Hospital of the City and County of Denver, is operated, maintained and controlled pursuant to the Charter of the City and County of Denver, and in compliance with State statutes pertaining to the maintenance and operation of county hospitals, for the purpose of preserving, protecting and maintaining the health and welfare of the people of The City and County of Denver * * *."

Dr. Collett qualified as an expert witness and testified that in his opinion plaintiff's present condition was caused by the burns which she received at the hospital.

Defendant offered no evidence. It relied on the contentions: (1) That plaintiff had failed to show negligence; (2) that the condition of plaintiff was congenital; (3) that no notice was given to the City within ninety days of the injury as required by statute; (4) that the statute of limitation barred recovery; and (5) that the City was not liable, under the doctrine of immunity, for negligence in the performance of a governmental function.

## Questions to be Determined.

First. *Where a person suffers personal injuries proximately caused by the negligence of employees of the City and County of Denver while caring for such person as a patient in a hospital operated by the city for the purpose of preserving, protecting and maintaining the health of the people of the city; is the municipality liable*

*for the damages caused by the negligence of said employees?*

This question is answered in the negative. Very firmly settled in the law of this state is the rule that a municipality is not liable for the acts of officers, agents or employees, committed by them in the discharge of functions or duties which are governmental in nature and which are "exercised in virtue of certain attributes of sovereignty delegated to it for the welfare and protection of its inhabitants." *Moses v. City and County of Denver*, 89 Colo. 609, 5 P. (2d) 581. It is equally well established that the municipality is liable for the negligent acts of its agents in the performance of duties related to the proprietary or private corporate purposes of the city. As stated in *Moses v. Denver*, supra:

" * * * In the former case its functions are political and governmental, and no liability attaches to it either for nonuser or misuser of a power; while in the latter, it stands upon the same footing with a private corporation, and will be held to the same responsibility with a private corporation for injuries resulting from its negligence."

This distinction between the exercise of governmental power on the one hand and proprietary or corporate power on the other, is clearly laid down in a long line of decisions of this court. *City of Denver v. Capelli*, 4 Colo. 25; *Veraguth v. The City of Denver*, 19 Colo. App. 473, 76 Pac. 539; *City of Denver v. Davis*, 37 Colo. 370, 86 Pac. 1027; *City and County of Denver v. Forster, Administrator*, 89 Colo. 246, 1 P. (2d) 922; *Meek v. City of Loveland, et al.*, 85 Colo. 346, 276 Pac. 30; *McIntosh v. City and County of Denver*, 98 Colo. 403, 55 P. (2d) 1337; *Schwalb, et al. v. Connely*, 116 Colo. 195, 179 P. (2d) 667; *Barker, et al. v. City and County of Denver*, 113 Colo. 543, 160 P. (2d) 363; *Atkinson v. City and County of Denver, et al.*, 118 Colo. 322, 195 P. (2d) 977; *City and County of Denver v. Leonard Austria*, 136 Colo. 454, 318 P. (2d) 1101.

This differential between governmental and proprietary powers conferred upon municipal corporations, controls the question in a given case as to whether the city can be held liable for negligence of its agents. Counsel for plaintiff relies on the decisions of this court in *Ace Flying Service, Inc. v. Colorado Department of Agriculture, et al.,* 136 Colo. 19, 314 P. (2d) 278; *Colorado Racing Commission, et al. v. Brush Racing Association, Inc.,* 136 Colo. 279, 316 P. (2d) 582; and *Lavinia Frances Stone, as Admx., etc. v. Thomas G. Currigan, Auditor of the City and County of Denver,* 138 Colo. 442, 334 P. (2d) 740, in which the doctrine of sovereign immunity from suit in actions sounding in contract was repudiated. The rule announced in those cases has no application to actions ex delicto. The substantive law has always recognized the right of an individual to bring an action against a municipality with or without the consent of the city, and has provided that a good defense to an action against it for personal injuries caused by the negligence of its agent is shown, if at the time of the negligent act the agent was engaged in the performance of a duty pertaining to a governmental function. The injured person has, of course, a remedy against the actual tort-feasor. It is not within the province of the judicial branch of the government thus to change long established principles of law. This is a function of the legislature and in a particular area the legislature has performed its function by changing the rules. In 1949 the General Assembly adopted a statute providing, inter alia:

"In case any injury to the person or property of another is caused by the tortious operation of a motor vehicle by a state, county, municipal or quasi-municipal police, fire or health department while engaged in the line of duty, the state, county, municipality or quasi-municipality and the motor vehicle drivers thereof shall be liable for such injury to the extent hereinafter stated; and subject to all defenses and laws as the same apply to such actions founded on tort." (C.R.S. '53, 13-10-1.)

In *Maffei, et al. v. Incorporated Town of Kemmerer,* (Wyo. 1959), 338 P. (2d) 808, it was held in substance that although a rule of law which is merely the product of judicial decision, born of the necessities of particular circumstances, is subject to judicial repudiation when the reasons which gave rise to its adoption have failed or no longer exist, an ancient doctrine firmly embedded in the common law and which became so through long custom and usage cannot be judicially abrogated any more than courts are authorized to abolish statutory law because in their opinion the reason for the legislative enactment no longer justifies the continuance of the law.

■ Second. *Where a patient, admitted to a hospital operated by the City and County of Denver, was treated therein without charge by doctors and nurses employed by the municipality, and while being so treated suffered injuries due to the negligence of those in attendance; did the negligent acts or omissions of said attendants arise out of the performance of a governmental function of the municipality?*

This question is answered in the affirmative. In this connection we think it sufficient to quote from *Schwalb v. Connely,* supra, as follows:

"Municipal corporations exercise two classes of powers, 'one \* \* \* is of a public and general character, to be exercised in virtue of certain attributes of sovereignty delegated to it for the welfare and protection of its inhabitants; the other relates only to special or private corporate purposes, for the accomplishment of which it acts, not through its public officers as such, but through agents or servants employed by it. In the former case its functions are political and governmental, and no liability attaches to it, either for nonuser or mis-user of a power; while in the latter, it stands upon the same footing with a private corporation, and will be held to the same responsibility with a private corporation for injuries resulting from its negligence.' *Veraguth v. City of Denver,* 19 Colo. App. 473, 76 Pac. 539. 'The authorities

are practically agreed in placing certain general duties in the class that is governmental, and among those is the general duty of the preservation of the public health.' *Denver v. Maurer,* 47 Colo. 209, 106 Pac. 875. Considering that the hospital where the events upon which plaintiff relies occurred, was maintained and operated 'for the purpose of preserving and maintaining the health of the people of the said City and County of Denver,' as the stipulation emphasizes, we are persuaded that the municipal entity was carrying on in its governmental, not its corporate, capacity, hence would not be liable. 6 McQuillin Municipal Corporations (2d ed.) P. 1167, §2840; 37 Am. Jur., P. 888, §265."

See also *Durst v. County of Colusa,* 166 Cal. App. (2d) 623, 333 P. (2d) 789.

The judgment is reversed and the cause remanded with directions to dismiss the action.

MR. JUSTICE HALL, MR. JUSTICE FRANTZ and MR. JUSTICE DOYLE dissent.

MR. JUSTICE FRANTZ dissenting:

Neither the opinion of Mr. Justice Moore nor that of Mr. Justice Doyle contains doctrine that has true moorings in our common law. The opinion of Mr. Justice Doyle goes contra to the well-established rule that a municipally operated hospital is immune from liability for tort, enunciated in those cases which follow the doctrine of sovereign immunity in matters governmental. See 25 A.L.R. (2d) 203 for the universality of the rule.

In recognizing the sovereign immunity doctrine but denying its application to a municipally operated hospital, Mr. Justice Doyle would stay the inevitable interment of an anachronistic rule. Indeed, I thought we had seen the demise of the rule in our pronouncements in *Racing Commission v. Racing Association,* 136 Colo. 279, 316 P. (2d) 582, and *Stone v. Currigan,* 138 Colo. 442, 334 P. (2d) 740.

His opinion is really an example of the destruction of a rule by inchmeal. This court, and other courts as well, have via inch-by-inch, case-by-case attrition, been bringing about the gradual extinction of sovereign immunity. So far as I am concerned, I would forthrightly break from a doctrine, as I thought we already had, that should have died aborning.

Immunity of government from liability for a tort, on the theory of sovereignty, is a vestige of the absolutism of monarchical days in England and on the continent of Europe. "Rex non potest peccare" — the King can do no wrong — was once a maxim of the law of England. It developed from the esteem in which the Crown was held. Sovereignty, pre-eminence, perfection and perpetuity were deemed the principle attributes of the Crown. Broom's Legal Maxims, (9th Ed. by Byrne), page 30 et seq.

This relic of the past and of a form of government antithetical to ours, except during our early history when English colonies were established on the Eastern shores of this continent, had its genesis in the theory of the divine right of kings.

Woven into the texture of regal immunity was the inapplicability of the doctrine of respondeat superior. "The city was immune from liability because the doctrine of respondeat superior was held to be inapplicable. This was a rudimentary survival of the maxim, 'The King can do no wrong.'" *Evans v. Berry,* 262 N.Y. 61, 186 N.E. 203, 89 A.L.R. 387, per Judge Pound. As a palliative this obsolete doctrine of immunity was enlarged to signify that "the king can do no wrong, but his ministers may." *Hargrove v. Town of Cocoa Beach,* (Fla.) 96 So. (2d) 130, 60 A.L.R. (2d) 1193.

In eloquent terms the Crown and all its attributes were repudiated by the Declaration of Independence in 1776. We are reminded in the Declaration of Independence that men are endowed by their "Creator with certain unalienable rights; that among these are life, liberty,

and the pursuit of happiness. That to secure these rights, governments are instituted among men, deriving their just powers from the consent of the governed . . ." A new form of government, a republic functioning under a constitution, was established in 1787. A state — Colorado — pursuant to the enabling act adopted a constitution in 1876.

That Declaration and these constitutions recognized that the primary purpose of government is the protection of the person and property of men. "The rights of life and personal liberty are natural rights of men. 'To secure these rights,' says the Declaration of Independence, 'governments are instituted among men, deriving their just powers from the consent of the governed.' The very highest duty of the States, when they entered into the Union under the Constitution, was to protect all persons within their boundaries in the enjoyment of these 'unalienable rights with which they were endowed by their Creator.' Sovereignty, for this purpose, rests alone with the States." *United States v. Cruikshank et al.,* 92 U.S. 542, 23 L.Ed. 588.

In view of the purpose of government as established by these documents, it is difficult to understand why the sovereign immunity doctrine ever became so solidly engrafted on the body of our law. Perhaps the statement of Edwin M. Borchard in "Government Liability in Tort," 34 Yale Law Journal 1, explains it: "The reason for this long continued and growing injustice in Anglo-American law rests, of course, upon a medieval English theory that 'the King can do no wrong,' which *without sufficient understanding* was introduced with the common law into this country, and has survived mainly by reason of its antiquity." (Emphasis supplied.)

Predication for the doctrine of immunity expanded: "In the final analysis the immunity rests upon three grounds; first, the technical rule that the sovereign is immune from suit; second, the ancient idea that it is better that the individual should suffer an injury than

12

that the public should suffer an inconvenience; and third, that liability would tend to retard the agents of the city in the performance of their duties for fear of suit being brought against the municipality." "Distinction Between Governmental and Proprietary Functions of Municipal Corporations," by Doddridge, 23 Mich. L. Rev. 325.

Much of the common law of England has become the common law of Colorado, and this by virtue of C.R.S. '53, 135-1-1, which provides:

"The common law of England, *so far as the same is applicable* and of a general nature, and all acts and statutes of the British parliament, made in aid of or to supply the defects of the common law prior to the fourth year of James the First, excepting the second section of the sixth chapter of forty-third Elizabeth, the eighth chapter of thirteenth Elizabeth, and ninth chapter of thirty-seventh Henry the Eighth, and which are of a general nature, *and not local to that kingdom,* shall be the rule of decision, and shall be considered as of full force until repealed by legislative authority." (Emphasis supplied.)

Bringing into focus the doctrine of municipal immunity, since that is our immediate problem, we again advert to the excellent dissertation in 23 Mich. L. Rev. 325. The author says:

"The theory is that the municipal corporation has a dual function, one exercised as a mere agent of the State in the process of government, the other private in its nature in that it is exercised for the particular benefit of the corporation and its inhabitants as distinguished from those things in which the whole state has an interest. If acting in its governmental capacity, the municipality is not liable in tort for either a non-feasance or a misfeasance, because in so acting it is but the agent of the State and is so far a part of the State that it partakes of the sovereignty of the State in respect to immunity from suit. Concisely stated: the State is sovereign, the sovereign cannot be sued without its consent, the

municipality is a mere agent of the State, q.e.d., the municipality cannot be sued unless the State shows its consent by legislation. But, if the municipality is acting in its proprietary capacity, for the particular benefit of the inhabitants of the locality, it is not acting as an agent of the State but is merely exercising a privilege granted by the State and therefore does not partake of the immunity of the State."

It is a melancholy distortion of the temper of our institutions that the doctrine of immunity ever gained acceptance. Sovereign immunity is just as incongruous to our way of government as speaking of a squared circle. The reasons for its recognition are baseless, and when the reason for a law disappears, the law should no longer be given effect.

"Reason is the soul of the law, and when the reason for any particular law ceases, so does the law itself." *Biggerstaff v. Zimmerman,* 108 Colo. 194, 114 P. (2d) 1098; *Rains v. Rains,* 97 Colo. 19, 46 P. (2d) 740.

The Crown and its attributes never had a beginning in Colorado. The divine right of kings never became the divine right of government, either federally or in the state. These notions concerning the Crown of England are strange and alien to our system of government.

Our common law transposed the old order of rights and duties between government and the individual. As already noted, the primary duty of government is to protect the right of the person and his property, but in a controversy growing out of a tort committed by the government against a citizen, the doctrine of sovereign immunity reverses the relationship of duty and right. Instead of protecting the individual in his right to life, the State protects the collective body, the people, against the claim of the individual, although the people through their agent may have committed a tort seriously injuring the individual. Thus, sovereign immunity violates the primary duty of government toward the individual in

that it disregards natural rights and duties and is contrary to the spirit of federal and state constitutions.

Sovereign immunity finds no shelter in C.R.S. '53, 135-1-1. In fact, it is inferentially excluded as a part of the common law of this state. The only common law of England made a part of the common law of Colorado is that part which may be applicable and which is not local to England. It would only labor the point to elaborate further upon the basis of the archaic rule granting sovereign immunity. Where a common law rule of England is not applicable and where it is local to that kingdom it has no force in this state. *Biggerstaff v. Zimmerman*, supra; *Rains v. Rains*, supra.

The other two grounds for sovereign immunity are so well exploded in the "Comment Note" in 120 A. L. R. 1376 that I quote therefrom liberally:

"The mere statement of the second ground condemns it. True democratic principles do not countenance the doctrine that it is better that an innocent individual should suffer a great injury without remedy than that the community at large should be subjected to the risk of slight inconvenience. As indicated in an earlier annotation, the damage resulting from the wrongful act of the government should be distributed among the entire community constituting the government, where it could be borne without hardship and where it justly belongs, rather than imposed entirely upon the single individual who suffers the injury. See the annotation in 75 A.L.R. 1196. The rule of immunity leaves the burden where fate casts it. No greater element of blind chance, and little more of injustice, would be involved if the law required that the damage sustained by the injured person be paid by another individual selected by lot.

"The third ground is purely argumentative; and, so far as the argument goes, it supports the opposite rule as much as it does the doctrine of immunity. For it may be urged that the recklessness of municipal employees and officers needs to be 'retarded,' and if the abrogation

of municipal immunity would operate as a deterrent upon the negligence of such persons, it would serve a highly desirable end."

Text writers are in unison in condemning the doctrine of sovereign immunity. It is no exaggeration to say that in excess of two hundred law articles have been written excoriating the doctrine as an anachronism in America. As suggested above, unfortunately the retreat from this doctrine is almost imperceptible. Apparently courts of the several states are awaiting action by their legislatures to extirpate a rule that should never have gained root in this country.

I believe that this court should do that which was done in the case of *Hargrove v. Town of Cocoa Beach,* supra. In a well reasoned opinion immunity was held to be no longer the law in Florida. The court said:

"Immunization in the exercise of governmental functions has been traditionally put on the theory that 'the king can do no wrong but his ministers may.' In applying this theory the courts have transposed into our democratic system the concept that the sovereign is divine and that divinity is beyond reproach. In preserving the theory they seem to have overlooked completely the wrongs that produced our Declaration of Independence and in the ultimate resulted in the Revolutionary War. We, therefore, feel that the time has arrived to declare this doctrine anachoristic [sic] not only to our system of justice but to our traditional concepts of democratic government.

\* \* \*

"We therefore now recede from our prior decision which hold that a municipal corporation is immune from liability for the torts of police officers. Affirmatively we hold that a municipal corporation may be held liable for the torts of police officers under the doctrine of respondeat superior. \* \* \*

"Subject to the limitations above announced, we here merely hold that when an individual suffers a direct,

personal injury proximately caused by the negligence of a municipal employee while acting within the scope of his employment, the injured individual is entitled to redress for the wrong done. * * * "

This court has held that the doctrine of sovereign immunity is no longer in effect in Colorado. At least I thought that the axe truly had been laid to the root of the tree. Mr. Justice Hall declared in *Racing Commission v. Racing Association,* supra: "In Colorado 'sovereign immunity' may be a proper subject for discussion by students of mythology but finds no haven or refuge in this court." In another case, *Stone v. Currigan,* supra, Mr. Justice Hall in clearest language stated: "The decision in the *Montezuma* case is predicated on the doctrine that a *county* is merely an arm of the state; that the state is sovereign and as such is, unless expressly named therein, immune from sanctions imposed by statutes. The doctrine of sovereignty in Colorado is in limbo, only the memory lingers on. Sequiturs that emanated from the doctrine such as 'immunity from suit,' 'immunity from paying interest,' 'immunity from the statute of limitations,' etc., have with the demise of the doctrine become non-sequiturs. * * * "

I am for a declaration by this court to the effect that sovereign immunity should never have been recognized in Colorado since the foundation for the rule never existed in this state. Hence, I would affirm the judgment.

I am authorized to say that Mr. Justice Hall concurs in this opinion.

Mr. Justice Doyle dissenting:

I would affirm the judgment of the trial court but would do so on a much narrower basis than that set forth in the dissenting opinion of Mr. Justice Frantz.

This case, in my opinion, does not call for a determination as to whether or not the doctrine of sovereign immunity applicable to the state, the municipal corporation,

the school district and other governmental agencies should be "repealed" by judicial decision. If I were of the opinion that the activity in question should be classified as governmental, I would vote for reversal because my view is that this deeply embedded body of law cannot be changed by a simple judicial decree — that it rests on policy considerations and that it is for the legislature to determine questions of policy. Thus I agree with the comment of the majority opinion that "This is a function of the legislature and in a particular area the legislature has performed its function by changing the rule." The majority is there referring to the 1949 statute which waived immunity with respect to injuries caused by emergency vehicles. *Session Laws of 1948,* p. 268.

My disagreement with the majority opinion stems from the fact that it blindly adheres to precedent. In effect its position is that regardless of the legal or historical soundness of the conclusion that the activity here in question is properly classified as governmental we are powerless to examine it against recognized standards and redefine it. To my mind, the judicial process involves a case by case analysis and the common law evolves in this manner, and it is thus within our province to re-examine the categories with which we are here dealing. They are not closed ones which can never be modified even though the circumstances which gave rise to them have changed.

In order to adequately show my viewpoint, it is necessary to review the history of the immunity rule and to examine the basis for it, its basis as applied to municipal corporations, and to show the standards which properly apply to solution of the problem here raised.

The immunity of governments from liability for torts originated in the idea that "the King can do no wrong." It extends to the governments of the United States and each state with statuory modifications. Though still applied, it has become discredited and owes its continued existence and vitality to various policy considerations.

*Borchard, Governmental Responsibility in Tort,* 36 Yale
L.J. 1, 39. The rule is said to have been extended to
municipal corporations and other governmental sub-
divisions by a misapplication of the early English deci-
sion in *Russell v. Men of Devon* (1788), 100 Eng. Rep.
359. This misinterpretation occurred in *Mower v. Lei-
cester* (1812), 9 Mass. 247. See *Borchard,* 34 Yale L.J.
129. Although some early American decisions at first
refused to extend immunity to municipal corporations
it became firmly established as part of our law as a
result of the decision in *Bailey v. New York,* 3 Hill
(N.Y.) 531, 38 Am. Dec. 669 (1842). Ironically enough,
the rule of immunity of public hospitals has been long
since abandoned in the land of its birth, England, and
also in Canada. *Hillyer v. St. Bartholomew's Hospital*
(1909), 2 K.B. 820; *Gold v. Essex County Council* (1942),
2 K.B. 292, 2 All Eng. 237; *Cassidy v. Ministry of Health*
(1951), 2 K.B. 343; *Nyberg v. Provost Municipal Hospital
Board* (1927), Can. Sup. Ct. 226.

At present, although universally condemned by courts
and text writers alike, the doctrine is consistently ap-
plied (in tort cases at least) except to the extent that
immunity has been waived by *statute* or *constitutional
amendment,* and except where courts have taken a more
critical look at the traditional "governmental" and "pro-
prietary" classifications and have redefined and nar-
rowed the former group. See *Prosser, Torts,* 774, 775;
*Rhyne, Municipal Law,* 730, etc.; *Harper & James, Torts,*
1619, Sec. 29.6, etc.; 75 A.L.R. at page 1196, 120 A.L.R. at
page 1377, 25 A.L.R. (2d) at pages 207-209. *Borchard,
Governmental Liability in Tort;* 34 Yale L.J. 1, 129 and
229; and *Governmental Responsibility in Tort;* 36 Yale
L.J. 1, 757, and 1039; *Fuller and Casner, Municipality
Tort Liability in Operation;* 54 Harv. L. Rev., 437. See
also the concurring opinion of Peters, P.J. and the dis-
sent of Carter, J. in *Madison v. San Francisco,* 106 Cal.
(2d) 253, 236 P. (2d) 141.

This Court has repudiated the doctrine of sovereign

immunity in actions sounding in contract. *Colorado Racing Commission v. Brush Racing Assn.,* 136 Colo. 279, 316 P. (2d) 582; *Ace Flying Service v. Colorado Dept. of Agriculture,* 136 Colo. 19, 314 P. (2d) 278, and *Stone v. Currigan,* 138 Colo. 442, 334 P. (2d) 740. In the latter case Mr. Justice Hall relegated "the doctrine of sovereignty . . . to limbo, only the memory lingers on," but something more than memory exists in tort actions. In this field immunity has never departed, and notwithstanding there is almost universal agreement among courts and text writers that the sovereign immunity doctrine is ill-founded, illogical and unjust, it is so deeply imbedded, and with all of its corollaries is such a large body of law, as to be not subject to judicial uprooting. It is generally agreed that where immunity exists, it can be waived only by legislative action. On this *Prosser,* supra, has said at p. 775:

" * * * The courts are so far bound, however, by precedent and existing classifications that any real reform of the law must come by statutes, * * * "

See also *Harper & James,* supra, 1613, *Borchard,* 34 Yale L.J. 137. Since the immunity of the state is not subject to waiver or consent at the hands of the judiciary the narrow question here is whether the treatment of the indigent sick is a governmental activity clothed with the claimed immunity.

The reasons appearing in the decisions supporting the doctrine of immunity of the *state* are generally reasons of public policy. These are summarized by *Harper & James,* supra, Sec. 29.3. The authors call attention to an often cited dictum of Justice Holmes in *Kawananakoa v. Polyblank,* 205 U.S. 349 "[a] sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends," and note that the "absence of right" theory which is there expounded is not supported in history and is of no help

"in solving the problem whether a modern democratic society should, as a matter of either morals or expediency, assume liability . . ." Other recognized reasons cited by the authors include: (1) since the sovereign can do no wrong it can not authorize a servant to commit a tort. As a consequence the servant's tortious acts are ultra vires — the doctrine of *respondeat superior* never applies. (The City advances this concept — the same could be said of any master or principal), (2) funds of the sovereign are public and can not be devoted to private compensation, (3) the public service would be undermined and hindered and the public safety endangered if the state could be subjected to suit at the instance of every citizen, (4) governments would be embroiled in endless suits which would impair efficiency. Thus the judicial motivation for the rule appears as concern about interference with government activities and possible prevention of uninhibited government action, together with apprehension as to excessive cost.

Other underlying reasons given which are also here urged by the City to be applicable are: " * * * that in the performance of such duties public officers are agents of the state and not of the corporation, so that the doctrine of *respondeat superior* does not apply; . . . and that it is unreasonable to hold the corporation liable for negligence in the performance of duties imposed upon it by the legislature, rather than voluntarily assumed under its general powers." *Prosser, Torts*, 774 (2d Ed.)

Whether immunity should be extended to a particular activity has traditionally depended on whether it is held to be governmental or proprietary. Often this is determined arbitrarily and this categorical method has produced illogical results such as holding street maintenance to be proprietary and garbage collection to be governmental. *Seavey, Keeton & Keeton, Cases on Torts*, 52.

However, the criteria and tests which have been used by the courts for determining whether functions are governmental, are hardly more helpful than the arbi-

trary categorical approach. It is generally agreed that a municipal corporation has no inherent immunity — that it can be *sued* but that it enjoys immunity from liability to the extent that it acts as an agency of the state in the performance of duties which have been delegated to or which the state has authorized it to perform. *Prosser, supra,* Sec. 109, pp. 774, 775, 2 *Harper & James,* supra, 1623-1625. Other specific criteria most often invoked are said to be:

" * * * (1) whether the function is allocated to the municipality for its profit or special advantage or whether for the purpose of carrying out the public functions of the state without special advantage to the city, and (2) whether the function is one historically performed by government. '[I]t is only where the duty is a new one, and is such as is ordinarily performed by trading corporations, that an intention to give a private action for a neglect in its performance is to be presumed.'

"These criteria are elusive and unsatisfactory. All the functions of a municipality are — or should be — for the public benefit. They are none the less so because they serve directly and primarily only a limited segment of the public rather than all the people of the state. To the extent that cities are instrumentalities of the state, their main function is to serve the state's purposes locally. The fact that the municipality makes a charge or a profit in connection with the service rendered has often been considered; but functions have been held governmental in spite of a charge, and functions have been held proprietary where there is neither charge nor profit. The historical test is a suggestive guide though a faltering one. Many of the functions now generally considered governmental were privately performed in the not very distant past. Little wonder that courts and commentators have despaired of finding a rational and consistent key to the distinction. * * * " 2 *Harper & James,* 1621-1623.

At times the determination whether the City has im-

munity rests on whether the power or duty is mandatory or permissive. Thus, immunity exists if the duty is a mandatory one but is non-existent if it is discretionary. Other courts determine this question with reference to whether the act is discretionary or ministerial, recognizing immunity if it is discretionary. Other courts have distinguished between acts of misfeasance and acts of nonfeasance holding that a municipality is liable for active exposure to unreasonable risk of harm but not liable for its passive failure. *Rhyne,* supra, pp. 735, etc.

The activities which have been generally recognized as governmental are summarized in 2 *Harper & James,* supra, 1623:

" * * * So far as precedent goes, the following activities illustrate those which are generally held to be governmental: legislative activity (such as the passage or repeal of, or failure to pass, an ordinance); police activity; fire fighting; education; and public health. On the other hand the operation and maintenance of utilities (waterworks, sewer systems, gas or electric plants, street railways, airports) are generally regarded as proprietary functions. There is conflict among the authorities as to street cleaning, garbage collection, parks, swimming pools, and the erection and maintenance of public buildings. Streets and highways deserve separate treatment. * * * "

Conclusions of the courts in these matters are often arrived at by generally referring to the classifications of the decided cases and by determining whether the activity in suit fits within one of such classifications. If this approach were used here, the result would be a holding that the present activity is public health and consequently governmental. The case noted in 25 A.L.R. (2d) 200, *Schroeder v. St. Louis,* 360 Mo. 293, 228 SW (2d) 677, 25 A.L.R (2d) 200, is typical of this type of mechanical method. Here it was said:

" * * * The preservation and safeguarding of public health is within the police power of a city government.

That is the generally recognized rule. See 62 CJS, Municipal Corporations, § 133, p. 278, and cases there cited. By the weight of authority the establishment and maintenance of a hospital by a city is considered a governmental activity, and hence the city is held not liable in tort actions. 63 CJS, Municipal Corporations, § 905, p. 311; 26 Am Jur 594, Sec. 13.

"A few states hold to the contrary as evidenced by cases cited by plaintiffs. They are: City of Miami v. Oates, 152 Fla 21, 10 So (2d) 721; City of Okmulgee v. Carlton, 180 Okl 605, 71 P. (2d) 722; City of Shawnee v. Roush, 101 Okl 60, 223 P. 354; Sanders v. City of Long Beach, 54 Cal App (2d) 651, 129 P. (2d) 511, loc cit 516 (9), citing Bloom v. City and County of San Francisco, 64 Cal. 503, 3 P. 129. In all of the above cases the courts held that a city was not performing a governmental function when operating a hospital. The cities were therefore held liable."

This Court in *Meek v. City of Loveland,* 85 Colo. 346, 276 P. 30, failed to go even that far. The case was apparently decided by assumption of the premise that treatment of the sick is governmental. No clue to the court's reasoning appears in the opinion. It merely declares that the trial court correctly sustained the city's demurrer. Since this is the only semblance of a precedent on the particular point it should not be regarded as controlling and the subject is thus open to consideration and to acceptance or rejection of tendered tests and criteria.

A more specific and reasoned method is prescribed in *Denver v. Davis,* 37 Colo. 370, 86 P. 1027 and *City and County of Denver v. Austria,* 136 Colo. 454, 318 P. (2d) 1103. In the *Davis* case it was said:

"The rule which determines the liability or nonliability of a municipality in cases of this nature is the character of the duty performed rather than the department, officer, or agent of the corporation by whom the duty is performed. * * * We think that the evidence

in this case clearly establishes the fact that the establishment and maintenance of this dumping ground was for the convenience and benefit of the inhabitants of the city, and as an adjunct to the street cleaning department of the city, *and was not in the discharge of any public duty imposed upon the city by the state; that it was local and special in its character.* * * * (Emphasis supplied.)

See also *City and County of Denver v. Austria,* supra, wherein the Court declared:

" * * * As to the non-liability, as claimed by the city because it was acting in its governmental capacity, the general trend of decisions is to restrict the doctrine of governmental immunity and non-liability and construe the doctrine strictly against the city."

* * *

"The contention of the city seems to be that because the statute requires the erection and maintenance of a courthouse that every activity connected with that courthouse is a governmental function. If the city sees fit to carry on other activities, not necessary in the performance of its governmental functions, then it assumes the risk of liability for its torts in the conduct or operation of such activities. * * * "

The *Davis* and *Austria* cases teach us that more particular and careful analysis of the particular facts is demanded, and that we must apply such criteria as are available even though these are conceded to be imperfect.

Study of the cases collected in the annotation of 25 A.L.R. (2d) 229-230 shows that very often the decisions are made on the basis of whether or not the patient has paid a fee or whether the activity is conducted on a profit basis. Emphasis of this profit factor will almost invariably result in the conclusion that the conduct is governmental, and if this criterion were always applied few activities would be held to be non-governmental because municipalities seldom, if ever, conduct a profit

producing business. It would seem, therefore, that this should be rejected as a controlling criterion.

The fact that the activity benefits the entire community is inconclusive. Most every municipal activity affects directly or indirectly the entire community. Highway maintenance, for example, certainly has such an effect and yet anomalously it is often held to be proprietary. *Borchard,* 34 Yale L.J. 229.

Merely because the conduct occurs within the walls of a public hospital does not mark it as governmental. *Denver v. Davis,* supra, and *City and County of Denver v. Austria,* supra. Some such activity might be so classified. This might be true of hospital administration, public health activities such as planning, inspecting and carrying out the particular mandates of statutes and ordinances. For example, *Schwalb v. Connely,* 116 Colo. 195, 179 P. (2d) 667 recognizes that the performance of an autopsy is governmental and thus immune. This latter, however, is incidental to the state's police function and is properly so classified.

A more realistic test and one which is in accord with the history of municipal immunity is whether the activity is being carried on as an agency of the state and under the mandate of state law. Where this is true it can be argued that the municipality in exercising the state's power is entitled to the immunity which the state would have if it were performing the function itself. Immunity at the local level is conceded to be dependent upon existence of immunity at the state level and thus this criterion offers a more accurate gauge of whether the activity is governmental or non-governmental than the approach by category or the profit test. Cf. 2 *Harper & James,* supra, 1622, and the cases cited in note 21. See also *Miami v. Oates* (1942), 152 Fla. 21, 10 So. (2d) 721, and *Tuengel v. City of Sitka* (Alaska 1953), 118 F. Supp. 399.

In the *Tuengel case,* supra, the Court reasoned:

" * * * Incidentally, it should be noted that the term

'rule,' so often used in describing the immunity doctrine, is really a misnomer, for it is the general rule that one is liable for his negligence or tortious conduct, and hence all concepts of immunity are really exceptions to the rule. In the older cases liability of a municipality in the operation of a hospital turned on the character of the function as proprietary or governmental. Whether it is labeled as one or the other depends on distinctions that appear to be artificial and arbitrary, as a comparison of the authorities cited in 25 A.L.R. (2d) 211-213, with those cited on pages 213-214 will disclose. The rule that appears preferable and sound is the one prevailing in England and Canada which denies immunity and holds political subdivisions of the government liable for the negligence of their servants in the operation of a hospital to the same extent as private individuals, notwithstanding that they may act in the performance of public duties or eleemosynary and charitable functions, 25 A.L.R. (2d) 216. * * * "

In the *Miami* case the Florida Court declared:

"The maintaining of hospitals for the benefit of the citizenry was not under the common law a function required to be performed by the government, nor a duty which the government would assume to owe to the citizenry."

And in *Hillyer v. Governors of St. Bartholomew's Hospital* (Eng. 1909), 2 K.B. 820, Farwell, L.J. said:

"It is now settled that a public body is liable for the negligence of its servants in the same way as private individuals would be liable under similar circumstances, notwithstanding that it is acting in the performance of public duties. * * * "

Another test which seems more sensible is whether the activity is one which has been exclusively conducted by public authorities, and whether private business is liable in the same area. In Colorado a private hospital is liable for its torts. *St. Luke's Hospital v. Long,* 125 Colo. 25, 240 P. (2d) 917.

Though the Denver General Hospital is conducted in accordance with state law, it is not operated under any statutory mandate. See C.R.S. '53, 66-3-41. Furthermore, the care of indigent sick has been a local function in America and in Colorado from the earliest times and when a locality acts to perform this function for the benefit of its citizens it is impossible to conclude that it is doing so as an agency of the state and that it is therefore entitled to the immunity which the state enjoys in the performance of its governmental functions.

I am of the opinion, therefore, that the conduct here in question is primarily local. The City of Denver operates this hospital not as an agency of the state but rather for the benefit of its own citizens. Though phases of the hospital administration function may be governmental in the main, its treatment of the sick is the same type of activity that is performed by private corporations or private individuals. Therefore, I am unable to agree that it must be classified as governmental. In my opinion, it has more character as a non-governmental activity than as governmental. Consequently, the trial court was correct, in my opinion, in overruling the City's contention and in submitting the case to the jury.

Finally, the injustice of holding as the majority holds that governmental immunity is in "limbo" as far as contract rights are concerned and that litigants can sue the state on claims *ex contractu* and at the same time to hold that in a personal injury case the litigant has no remedy is at once apparent. This comparison is well expressed in 25 A.L.R. 210:

" * * * The shocking effect of the immunity doctrine is well illustrated by the fact that, in the view of some courts, no immunity attaches where property rights are violated by governmental action, but does attach where it is merely a matter of the life or limb of a human being. * * * "

This judgment should be affirmed.