No. 18,642.

STANLEY LIBER *v.* LEO FLOR, ET AL.
(353 P. [2d] 590)

Decided May 31, 1960.   Rehearing denied August 2, 1960.

Mr. MELVIN M. BELLI, MCLEAN & MCLEAN, for plaintiff in error.

Mr. ANTHONY F. ZARLENGO, Mr. J. FREDERICK SCHNEIDER, Mr. JEROME A. PAUL, for defendants in error.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the Court.

WE will refer to the parties as they appeared in the trial court where plaintiff in error was plaintiff and defendants in error were defendants.

The action was filed by plaintiff in the district court of Ouray county to recover damages for the alleged tortious acts of defendants in storing dangerous explosives in a manner constituting an "ultra-hazardous activity."

The defendants named individually and the defendant designated "Board of County Commissioners of the County of Ouray, Colorado," filed an answer in which they alleged a number of defenses among which was the assertion that plaintiff's complaint did not state facts sufficient to constitute a claim for relief against the defendants or any of them. Upon consideration of this particular defense the trial court ordered dismissal of the action and entered judgment for defendants. Plaintiff is here on writ of error.

The trial court, in entering the said judgment, commented as follows:

" * * * cases of this same nature have been passed upon by the Supreme Court of the State of Colorado, said cases holding in this state that counties are not liable for torts, and that it would be inconsistent to re-

lieve counties from liability and yet hold the officers liable, that it is immaterial whether such failure complained of on the part of the officers takes the form of negligence, nonfeasance or misfeasance. * * *"

The trial court unquestionably grounded its judgment upon the well established rule that a county is exempt from liability in tort actions based upon alleged negligence of its agents. C.R.S. '53, 36-1-1, provides:

"Each organized county within the state shall be a body corporate and politic, and as such shall be empowered for the following purposes:

" (1)    To sue and be sued. * * *"

█    The first question presented by the record in the instant case is whether under the substantive law the county is liable to respond in damages for the negligent conduct of its agents. This court has not heretofore held that the state is liable in damages for the negligence of its servants; nor has it been held that other governmental corporate entities are liable for the tortious acts of their servants performing duties in furtherance of a governmental function, as distinguished from a proprietary function. Numerous decisions of this court have established the rule of no liability in such cases. *County Commissioners v. Bish,* 18 Colo. 474, 33 Pac. 184; *Pitkin County v. Ball,* 22 Colo. 125, 43 Pac. 1000; *Town of Fairplay v. Park County,* 29 Colo. 57, 67 Pac. 152; *Miller v. Ouray Electric Light and Power Company et al.,* 18 Colo. App. 131, 70 Pac. 447; *Richardson v. Belknap,* 73 Colo. 52, 213 Pac. 335; *Board of County Commissioners of Logan County v. Adler,* 69 Colo. 290, 194 Pac. 621.

Our adherence to the well established rule in the above cited cases was announced in the case of *City and County of Denver v. Madison,* 142 Colo. 1, 351 P. (2d) 826. Insofar as the liability of the County of Ouray is concerned this cause is controlled by the rule of the Madison case, supra. The trial court committed no error in dismissing the action as to the county.

The second question which requires determination is

whether the complaint states a claim against the individually named defendants. It is alleged in the complaint, in pertinent part:

"That the defendants or their agents, servants or employees who were then and there acting in the scope of their employment by the defendants, on the said date and for a long time prior thereto, had been storing large quantities of explosives, which were intrinsically dangerous in nature, in dangerous proximity to persons rightfully upon the public highway. The defendants knew or should have known, in the exercise of reasonable care, that there was a real and substantial danger to passersby and persons in proximity to the shed from the storing of the said dangerous explosives on the premises, and they well knew the dangerous character of the said explosives; yet, they negligently permitted the said explosives to remain in the said dangerous place and negligently failed to warn the public or the plaintiff of the dangers attendant thereto."

\*   \*   \*

"That the conduct of the defendants described herein was negligent and careless, and that said negligence and carelessness was the proximate cause of the injuries and damages to the plaintiff described hereinabove."

These allegations are sufficient to state a claim for relief against the individual defendants when considered in connection with the allegations of damage suffered by plaintiff. From all that appears on the face of the complaint the individual defendants were the actual tort feasors, and if the evidence establishes this fact as to any one or more of them, they should be held liable in all respects as other tort feasors.

While there is nothing in the complaint to indicate that the individual defendants are members of the Board of County Commissioners of Ouray county, their status as such appears to be conceded in the briefs and arguments herein. Even so, this fact alone would not absolve them from individual liability. The applicable

rule is stated in *Schwalb et al., v. Connely,* 116 Colo. 195, 179 P. (2d) 667, where 46 C. J. §330 is quoted as follows:

"The doctrine of respondeat superior applicable to the relation of master and servant does not apply to a public officer so as to render him responsible for the acts or omissions of subordinates whether appointed by him or not, unless he, having the power of selection, has failed to use ordinary care therein, or unless he has been negligent in supervising the acts of such subordinates, or has directed or authorized the wrong."

Thus, if the individual defendants were the actual tort feasors, or if the evidence is such as to bring their acts within the above quoted rule, the plaintiff would be entitled to recover. It follows that the trial court erred in dismissing the action as against defendants Flor, Porter and Zadra.

The judgment is reversed.

MR. JUSTICE HALL, MR. JUSTICE FRANTZ and MR. JUSTICE DOYLE dissent.

MR. JUSTICE HALL dissenting:

I respectfully dissent from the majority opinion.

Liber, at the time of his birth and at the time of his injuries, was clothed with certain inalienable rights which he and his forebears had never relinquished and which are expressly recognized by:

(1) The Declaration of Independence:

"We hold these truths to be self-evident:—that all men are created equal; that they are endowed by their Creator with certain unalienable rights; that among these are life, liberty, and the pursuit of happiness. * * *."

(2) Article V of the Amendments to the Constitution of The United States of America:

"No person shall be * * * deprived of *life,* liberty, or *property,* without due process of law; * * *." (Emphasis supplied.)

(3) Article XIV, §1, of the Amendments to the Constitution of The United States of America:

" * * * nor shall any state deprive *any person* of *life, liberty* or *property* without due process of law, * * *." (Emphasis supplied.)

(4) Article II, Constitution of the State of Colorado:

"Section 1. All political power is vested in and derived from the people; all government, of right, originates from the people, is founded upon their will only, and is instituted *solely for the good of the whole.*

\* \* \*

"Section 3. All persons have certain *natural, essential* and *inalienable rights,* among which may be reckoned the right of enjoying and defending their lives and liberties; of *acquiring, possessing and protecting property;* and of seeking and obtaining their safety and happiness.

\* \* \*

"Section 6. Courts of justice shall be open to every person, and a *speedy remedy afforded for every injury to person, property or character;* * * *.

\* \* \*

"Section 25. No person shall be deprived of life, liberty *or property, without due process of law.*" (Emphasis supplied.)

Liber, having lost a leg and suffered other injuries arising out of the alleged gross negligence of the defendants, invoked the aid of the district court, and in his complaint asserted his rights and demanded a remedy commensurate with his rights. Without question the allegations of his complaint, had they been directed against an individual or private corporation, were adequate and sufficient, if proven, to have entitled him to relief. The trial court dismissed the action on the sole ground that:

" * * * in this state counties are not liable for torts and it would be inconsistent to relieve counties from liability and yet hold the officers liable * * *."

Precedent for the above statement can be found in several pronouncements of this court.

Study and analysis of these pronouncements disclose no reason, other than precedent, why recovery may not be had against a county and its agents for their tortious acts. Reviewing these cases in the chronological order in which they were decided leads me to the conclusion that each and every one of them is erroneous, precedent on precedents that are lacking in reason, contrary to our whole system of government and violative of most valuable rights reserved to the people and guaranteed by the United States and Colorado Constitutions.

The earliest case is *County Commissioners v. Bish,* 18 Colo. 474, 33 Pac. 184, decided in 1893, wherein this court said:

"The rule that counties are not liable for torts, in the absence of statute, is universally acknowledged. And the great weight of authority is in favor of the conclusion that, even when a duty is imposed by statute, the county is not liable for failure to perform it, in the absence of express provision, creating such liability. The cases sustaining the latter conclusion are so numerous that space will not permit of their citation in this opinion. They will be found collated in part in the notes on page 364 of the fourth volume of the American and English Encyclopedia of Law, and also in note 1, page 303 of Cooley's Constitutional Limitations."

It will be noted that the court made no effort at analysis of the problem presented in light of the constitution or reason. Reading of the cases collated in the note on page 364, Vol. IV, American and English Encyclopedia of Law, invariably leads one back to the old English common law with all of its dogma as to sovereign immunity.

Next we have the case of *Pitkin County v. Ball,* 22 Colo. 125, 43 Pac. 1000, decided in 1895, in which Justice Campbell, speaking for the court, relying on precedent with no reference to reason, said:

" \* \* \* But for such tortious acts of its officers, or for acts clearly beyond their power, the county, in the absence of a statute, is not liable. *Board of County Commissioners v. Bish,* 18 Colo. 474, and cases cited; Mechem on Public Officers, sec. 850; 1 Beach on Pub. Corps., secs. 258-263 and chap. 20."

Then follows *Town of Fairplay v. Park County,* 29 Colo. 57, 67 Pac. 152 (1901), wherein this court again contented itself by quoting with approval the aforementioned language of *Commissioners v. Bish.*

The next case considered is *Miller v. Ouray E. L. & P. Co.,* 18 Colo. App. 131, 70 Pac. 447 (1902). This was a suit against the power company, the three county commissioners as individuals, the sheriff and the sureties on his official bond. The action was to recover damages for the death, by burning, of plaintiff's son while imprisoned in a faulty and negligently wired county jail. Again we have an unreasoned opinion of this court:

"This being true, a breach of the duty here charged will not support an individual action for damages against the commissioners. Mr. Cooley authoritatively lays down this doctrine, and it is supported by the great weight of authority, and so even in cases where a nonperformance of the duty might prejudice an individual. This is held not to constitute a private wrong for which the injured party could have redress by individual action.—Cooley on Torts, 2d ed., p. 446, *et seq.;* Mechem on Public Officers, §§598, 599, 606; Shearman and Redfield, *supra.* The court did not err in sustaining the demurrer of the county commissioners."

The above case was followed by *Commissioners v. Adler,* 69 Colo. 290, 194 Pac. 621 (1920), wherein this court again refers to *Commissioners v. Bish,* supra.

"Counsel for the defendant in error concede that a county is not liable for the torts of its agents, in the absence of an express statute making it liable; *County Commissioners v. Bish,* 18 Colo. 474, 33 Pac. 184. \* \* \*

"It being a prerogative of the state to be exempt from

coercion by suit, a provision of the fundamental law for compensation in case of damage, which is applicable to injuries caused by instrumentalities of the state, or by its agents, and to no other injuries, must be held to except such cases from the exemption. * * *."

Here, for the first time, the court states the reason for holding counties not liable for their torts; that reason in my humble opinion is the reasoning back of all of these county cases, and that is the doctrine of *sovereign immunity*.

Next is *Richardson v. Belknap,* 73 Colo. 52, 213 Pac. 335 (1923), wherein the court refers to *People v. Hoag,* 54 Colo. 542, 131 Pac. 400, and *Miller v. Ouray,* supra, and says:

"Applying the rule thus announced in the two Colorado cases above cited, it necessarily follows that since the duty the defendants are charged with violating or having violated is a duty to the public, the plaintiff cannot maintain an action against them on his own behalf."

Now let us turn to the pronouncements of this court touching on the doctrine of sovereign immunity in Colorado. The first such pronouncement appears in *In re Benedictine Sisters' Bill; In re Constitutionality of Substitute for Senate Bill No. 83,* 21 Colo. 69, 39 Pac. 1088 (1895). In that bill provision was made for payment of compensation to the Sisters for damages done to their building by blasting by officers and employees of the State Penitentiary. The acts complained of were clearly in tort. Therein this court said:

" * * * We recognize the doctrine that, without constitutional or legislative authority, the state in its sovereign capacity cannot be sued. No such authority exists in this state. This being so, *no liability upon contract or tort, if any there be, can be enforced against the state in any of its courts.*" (Emphasis supplied.)

Those are not the words of the legislature. They are the words of this court.

Significantly the court pointed to no authority for the

above broad statement and, more significantly, pointed out no reason for the rule. The statement is unpredented, unreasoned dictum — dictum for the reason that the court held that the Sisters should get their new building on the theory that the state had taken private property for public use and *the state* pursuant to constitutional provision had to make just compensation therefor.

We next hear of sovereign immunity in *Parry v. Board of Corrections,* 93 Colo. 589, 28 P. (2d) 251 (1933). In that case this court referred to *In re Benedictine Sisters' Bill,* supra, and quoted therefrom with approval the above quotation. No reason or explanation for the rule was assigned.

The next time the court spoke on sovereign immunity was in *D. & R. G. W. R. R. Co. v. Castle Rock,* 99 Colo. 340, 62 P. (2d) 1164 (1936), wherein this court by way of pure dictum stated, and without referring to any authorities or reason therefor:

" * * * The sovereign state could not be sued in the present connection unless express authority were given by the General Assembly. * * *."

The next decision of this court dealing with the subject was *State v. Colorado Co.,* 104 Colo. 436, 91 P. (2d) 481 (1939). This was an action to recover damages caused by the tortious actions of the state. Again this court quoted the same language from *In re Benedictine Sisters' Bill,* supra, and pointed out as further precedent for its holding *Parry v. Board,* supra; *Denver & R. G. Co. v. Castle Rock,* supra. The court made no effort to explain the reason for the rule, but did take note of the injustice of the situation, and stated:

"By reason of the despairing comment contained in the plaintiff's brief concerning its plight if denied the remedy of suit in court to enforce its claim, and required, figuratively speaking, to stand hat in hand as a mendicant before the legislature and the chief executive, *we are constrained to say that the ascertainment of the*

*state's constitutional liability* * * * is a proper function of the legislative department of government *(In re Constitutionality of Substitute for Senate Bill,* supra) * * * ." (Emphasis supplied.) `

In the above language this court for the first time recognized that there might be constitutional liability to a telegraph company for tortious acts of the state resulting in damages to the company property. In my opinion it is indeed unfortunate that this court did not at that time ascertain "the state's constitutional liability." I find no sanction for the statement that this "is a proper function of the legislative department of government." I am of the opinion that the courts, rather than the legislature, ascertain questions of liability arising under the constitution as well as those arising in any other way. The question to be ascertained in the case before us is the ascertainment of the constitutional liability of the county and its officers and whether that liability extends to plaintiff.

The next pronouncement of this court was in *Mitchell v. Commissioners,* 112 Colo. 582, 152 P. (2d) 601 (1944), and again there is a total failure to offer any reason for the court's pronouncement that:

" * * * Clearly the highway department is nothing more than an agency of the state and as to actions against it stands in the state's shoes. No permission has ever been granted to sue it. In the light of our holding in the following cases it is evident that this action can not be maintained against the highway department. *Parry v. Board of Corrections,* 93 Colo. 589, 28 P. (2d) 251; *State v. Colorado Co.,* 104 Colo. 436, 91 P. (2d) 481."

For the first time, in 1952, in *Boxberger v. Highway Dept.,* 126 Colo. 438, 250 P. (2d) 1007, this court gave some explanation of the rule of sovereign immunity and the alleged reasons therefor and, as I read the decision, pretty well scuttled the doctrine. The court said:

" * * * The doctrine of sovereign immunity originates through the course of unwritten common law. How-

ever, plaintiff's protection and his relief is provided for in the basic written law of our state, * * *. Our courts are to decide the rights of citizens, whether it be between themselves or between them and the government. It is with pride that we say, and it is freely known to every citizen, that our courts respond immediately to rescue a citizen from those holding him under asserted governmental authority and to give him relief as against the sovereign power if the circumstances warrant. This judicial power is conferred by the same constitutional provision and we see no reason to invoke a different doctrine as to remedy for the citizen whose property is wrongfully held by the sovereign or any other source of imposition. *The rights of a citizen remain the same whether they collide with an individual or the government,* and judicial tribunals were wisely established to correct such matters without the individual being relegated to the position of no other remedy except to appeal to a legislature, maybe to no avail, as all the people, or the citizens, are, in fact, the sovereign under our desirable form of government. * * *." (Emphasis supplied.)

Sovereign immunity was again discussed by this court in *Ace Flying v. Colo.,* 136 Colo. 19, 314 P. (2d) 278 (1957), and in which case the state was required to answer for its contractual obligations and denied the right to rely upon sovereign immunity as a defense.

This decision was followed by *Colorado Racing Commission v. Brush Racing Assn.,* 136 Colo. 279, 316 P. (2d) 582, a unanimous decision of this court, and *Stone v. Currigan,* 138 Colo. 442, 334 P. (2d) 740 (a decision of six members of this court, Justice Day not participating).

In view of the foregoing, it appears clear that the doctrine of sovereign immunity did not come from the people, the constitution, the executive branch or the legislative branch of our government. It is the handiwork of this court, arrived at by following pronouncements of courts of older states where the doctrine of sovereign

immunity was firmly embedded and which courts had accepted old English cases as a part of the common law of their states. The people, in adopting the constitution of Colorado, did not adopt the doctrine of sovereign immunity as a part of the framework of our government. The constitution says nothing on the subject. The legislature so far as my research discloses has never mentioned sovereign immunity or set up any inhibitions against suits of any kind or nature against the state, and has in fact adopted legislation providing that counties may "sue and be sued * * *."

C.R.S. '53, 36-1-1, provides for the form of the title of suits by or against the county; C.R.S. '53, 36-1-5, provides for the method of service of process on the county, and C.R.S. '53, 36-2-4, provides for the method of payment of judgments obtained against the county. The statute makes no distinction between so-called governmental and non-governmental functions; such distinctions are the handiwork of the courts, in my humble opinion, distinctions designed to give some measure of relief from the frightful consequences of the court-created doctrine of sovereign immunity (e. g., *City and County of Denver v. Madison,* No. 18,365, decided January 11, 1960).

With the announcement of *Boxberger v. Highway Dept., Ace Flying v. Colo., Colorado Racing Commission v. Brush Racing Assn.,* and *Stone v. Currigan,* above referred to, I had thought that the doctrine of sovereign immunity, immunity from liability because of sovereign status, immunity from suit or liability for wrongful acts committed or omitted in carrying out governmental functions, and all other supposed and claimed immunities from answerability, were definitely rejected and held to be of no further avail in judicial proceedings in Colorado. I had thought that this court had concluded that every person having a right should have a remedy against the person who or the agency that owed the duty out of which the right arose.

Rights and duties are correlative and commensurate.

Rights do not exist in a vacuum. Where there is a right there is a corresponding duty. Liber had an inalienable, natural, constitutional right to retain as a part of his body the leg which he alleges he lost through the fault of others.

In *County Commissioners v. City*, 66 Colo. 111, 180 Pac. 301, this court, in passing on the answerability of a county, said:

"If it be claimed that the law furnishes no remedy, the answer is that *the law always provides a remedy to enforce any right.* The proposition that any right can fail for lack of a remedy is obsolete." (Emphasis supplied.)

With government and its agencies at all levels expanding by leaps and bounds and constantly entering into activities that a few years ago would have been considered beyond the scope of governmental functions, there naturally follow more and more claims arising out of governmental activities. Out of this situation and application by the courts of *their* doctrine of sovereign immunity, more and more wrongs and hardships have fallen upon the people. As partial relief from this situation *many courts* have evolved the fuzzy distinction or difference between governmental and proprietary activities. For injuries arising out of one, there is a remedy; for the other, none. Lawyers and courts have difficulty in deciding whether certain activities are governmental or proprietary.

Efforts on the part of courts to differentiate between governmental and proprietary functions have led to weird results. In resolving such questions the plight and rights of the injured party receive no consideration. The grim fact remains — Liber lost his leg due to the negligence of others; whether storing the explosives was a governmental or nongovernmental act can have no bearing on his constitutional rights. Those who caused him injury and the county for which they acted should be held answerable for their wrongful acts, providing those acts were within their delegated authority.

The Supreme Court of the state of Florida, in *Hargrove v. Town of Cocoa Beach,* 96 So. (2d) 130 (Fla.), in renouncing the doctrine of sovereign immunity and its offspring, the differentiation between so-called governmental and nongovernmental functions, said:

"The problem in Florida has become more confusing because of an effort to prune and pare the rule of immunity rather than to uproot it bodily and lay it aside as we should any other archaic and outmoded concept. This pruning approach has produced numerous strange and incongruous results. While holding that a municipality can be held liable for the negligent operation of a fire truck, we have exempted a municipality from liability when a jailor assaulted a prisoner with a blackjack and produced a skull concussion which resulted in his death."

In *Irvine v. Town of Greenwood,* 89 S.C. 511, 72 S.E. 228, the Supreme Court of South Carolina, in rejecting the supposed distinction between governmental and proprietary functions of a town, stated:

"In endeavoring to put into practical effect the supposed distinction between public function and private business or enterprise of municipal corporations, it will hardly be doubted that the courts will find themselves involved in a maze of shadowy distinctions. Where is the line of demarcation to be drawn? If it could be satisfactorily laid out now, it could not long continue to receive general recognition; for the functions of government, especially municipal government, are being extended almost every day. * * *."

It is suggested that if the doctrine of sovereign immunity is to be overthrown, it should be done by legislative enactment. With that suggestion I do not agree. The legislature had nothing to do with creating the doctrine. The courts are to blame for the injustices flowing from the court-created doctrine, and the courts should abolish the doctrine in toto. The legislature cannot take away constitutional rights; to give legislative sanction to vested constitutional rights adds nothing thereto.

The Supreme Court of Florida has made complete answers to the various problems arising out of the doctrine of sovereign immunity. In *Hargrove v. Town of Cocoa Beach*, supra, the court said:

"The appellee here contends that any recession from the rule of immunity should come about by legislation rather than judicial decree. It is insisted that the immunity rule is a part of the common law which we have adopted and that therefore its abolition should come about only by statute. We are here compelled to disagree.

" * * * our own feeling is that the courts should be alive to the demands of justice. We can see no necessity for insisting on legislative action in a matter which the courts themselves originated.

* * *

" * * * we here merely hold that when an individual suffers a direct, personal injury proximately caused by the negligence of a municipal employee while acting within the scope of his employment, the injured individual is entitled to redress for the wrong done. * * *."

Last December, in *Molitor v. Kaneland Community Unit District No. 302* (Ill.), 163 N.E. (2d) 89, the Supreme Court of the State of Illinois, in a five to two decision, repudiated in toto the doctrine, and in doing so, in an exhaustive clear-cut opinion, pointed up cogent reasons for its actions. In the opinion full answer is made to the supposed reasons for the rule, the refinements thereof, the source of the rule, and just who has the power and duty of uprooting it. The court said:

"It is a basic concept underlying the whole law of torts today that liability follows negligence, and that individuals and corporations are responsible for the negligence of their agents and employees acting in the course of their employment. The doctrine of governmental immunity runs directly counter to that basic concept. What reasons, then, are so impelling as to allow a school district, as a quasi-municipal corporation, to commit wrong-

doing without any responsibility to its victims, while any individual or private corporation would be called to task in court for such tortious conduct?

\* \* \*

"We are of the opinion that school district immunity cannot be justified on this theory. As was stated by one court, 'The whole doctrine of governmental immunity from liability for tort rests upon a rotten foundation. It is almost incredible that in this modern age of comparative sociological enlightenment, and in a republic, the medieval absolutism supposed to be implicit in the maxim, "the King can do no wrong," should exempt the various branches of the government from liability for their torts, and that the entire burden of damage resulting from the wrongful acts of the government should be imposed upon the single individual who suffers the injury rather than distributed among the entire community constituting the government, where it could be borne without hardship upon any individual, and where it justly belongs.' Barker v. City of Santa Fe, 47 N.M. 85, 136 P. (2d) 480, 482. Likewise, we agree with the Supreme Court of Florida that in preserving the sovereign immunity theory, courts have overlooked the fact that the Revolutionary War was fought to abolish that 'divine right of kings' on which the theory is based.

\* \* \*

"Defendant strongly urges that if said immunity is to be abolished, it should be done by the legislature, not by this court. With this contention we must disagree. The doctrine of school district immunity was created by this court alone. Having found that doctrine to be unsound and unjust under present conditions, we consider that we have not only the power, but the duty, to abolish that immunity. 'We closed our courtroom doors without legislative help, and we can likewise open them.' Pierce v. Yakima Valley Memorial Hospital Ass'n, 43 Wash. (2d) 162, 260 P. (2d) 765, 774.

"We have repeatedly held that the doctrine of *stare*

*decisis* is not an inflexible rule requiring this court to blindly follow precedents and adhere to prior decisions, and that when it appears that public policy and social needs require a departure from prior decisions, it is our duty as a court of last resort to overrule those decisions and establish a rule consonant with our present day concepts of right and justice. Bradley v. Fox, 7 Ill. (2d) 106, 111, 129 N.E. (2d) 699; Nudd v. Matsoukas, 7 Ill. (2d) 608, 615, 131 N.E. (2d) 525; Amann v. Fardy, 415 Ill. 422, 114 N.E. (2d) 412. As was stated by the New Jersey Supreme Court in overruling the doctrine of charitable immunity: 'The unmistakable fact remains that judges of an earlier generation declared the immunity simply because they believed it to be a sound instrument of judicial policy which would further the moral, social and economic welfare of the people of the State. When judges of a later generation firmly reach a contrary conclusion they must be ready to discharge their own judicial responsibilities in conformance with modern concepts and needs. It should be borne in mind that we are not dealing with property law or other fields of the law where stability and predictability may be of the utmost concern. We are dealing with the law of torts where there can be little, if any, justifiable reliance and where the rule of *stare decisis* is admittedly limited. See Pound, supra, 13 N.A.C.C.A.L.J. at 22; Seavey, Cogitations on Torts, 68 (1954); Cowan, "Torts," 10 Rutgers L. Rev. 115, 119 (1955).' Collopy v. Newark Eye and Ear Infirmary, 27 N.J. 29, 141 A. (2d) 276, 283."

More recently, on February 25, 1960, the Supreme Court of the State of Michigan, in *Montgomery v. Stephan,* (Mich.), 101 N.W. (2d) 227, guided by reason which ran head-on into long established precedent, said:

" * * * Our concern is not with the family of the middle ages, with its tyrannies and abuses, but with the family of today. If this is the interest to be protected, and we conclude that it is, the law's protection should extend as well to the negligent as to the intentional in-

jury. In each case the loss is equally severe and the importance to our society of the welfare of the family unit outweighs the importance of the defendant's claims to immunity.

" * * * We are now at the heart of the issue. In such circumstances, when her husband's love is denied her, his strength sapped, and his protection destroyed, in short, when she has been forced by the defendant to exchange a heart for a husk, we are urged to rule that she has suffered no loss compensable at the law. But let some scoundrel dent a dishpan in the family kitchen and the law, in all its majesty, will convene the court, will march with measured tread to the halls of justice, and will there suffer a jury of her peers to assess the damages. Why are we asked, then, in the case before us, to look the other way? Is this what is meant when it is said that justice is blind?

"No, we see the suffering. But it is urged that the precedents tie us. A wife, said the ancient precedents, could not sue because she was a legal nonentity. And, even if she could, she had no cause of action to assert because a servant has no 'right' to the services of her master. * * *. The precedents of the older cases are not valid precedents. They are violative of women's statutory rights and constitutional safeguards. They are out of harmony with the conditions of modern society. They do violence to our convictions and our principles. We reject their applicability. The reasons for the old rule no longer obtaining, the rule falls with it. *The obstacles to the wife's action were judge-invented and they are herewith judge-destroyed.* * * *.

"So far as Blair v. Seitner Dry Goods Co., 184 Mich. 304, 151 N.W. 724, and Harker v. Bushouse, 254 Mich. 187, 236 N.W. 222, may be interpreted as authority otherwise, they are overruled." (Emphasis supplied.)

That language is the language of five members of that court. Three justices dissented, being unwilling to overthrow precedent, and further contending that the prob-

lem calls for legislative determination. One justice did not participate.

Former Chief Justice Holland, in speaking for the court in *Boxberger v. Highway Dept.,* 126 Colo. 438, 250 P. (2d) 1007, said:

" * * * The rights of a citizen remain the same whether they collide with an individual or the government * * *."

To that language I subscribe, and that language is and should be the answer to the problems presented in this case.

The second phase of the majority opinion deals with the question of whether public officials may be held answerable for their negligent acts in performing official duties. The majority seem to hold that county commissioners may be so held. The universal rule is to the contrary.

In 20 C.J.S. 881, §97, Counties, it is stated:

"The duties of members of a county board are ordinarily fixed by the legislature, and such members are not ordinarily personally liable to individuals for their negligent acts or omissions in connection with their official powers and duties, except where statutes expressly create such liability. The reason for exempting members of a county board from personal liability to individuals, in the absence of statute, is that, with respect to official acts, the members perform in an official, and not in an individual, capacity, and their duty is ordinarily to the public, rather than to any particular individual. * * *."

In *People v. Hoag,* 54 Colo. 542, 131 Pac. 400, this court, in speaking of the non-liability of a county clerk for his official actions or inaction, said:

" * * * When the duty imposed upon an officer is one to the public only, its non-performance must be a public, and not an individual injury, and must be redressed in a public prosecution of some kind, if at all. — 2 Cooley on Torts, (3rd Ed.) 756. Numerous instances are given by the author. For instance, the duty of a policeman is to watch the premises of individuals and protect them

against burglary and arson. If he goes to sleep in front of a house, and a burglar enters it or it burns down, which would have been prevented had the policeman been awake, the owner can not recover from the policeman, for the latter owed the former no legal duty. His duty was to the public. * * *."

In *Richardson v. Belknap*, 73 Colo. 52, 213 Pac. 335, cited in the majority opinion, plaintiff brought an action against the members of the Board of County Commissioners of Fremont County, and in his complaint alleged that:

" * * * the defendants, who were county commissioners, 'carelessly and negligently failed to erect or build on said bridge any stationary, permanent or safe railings, and carelessly and negligently failed to keep the railings on said bridge in repair.' "

In affirming the action of the trial judge in sustaining a demurrer to the complaint, this court said:

"The demurrer raises the question, and it is the only question that need be considered upon this review, whether the county commissioners are liable, as individuals, for injuries caused by their failure to maintain and keep in repair a public highway. In the view we take of this case, as hereinafter appears, it is immaterial whether such failure takes the form of negligence, nonfeasance or misfeasance.

\* \* \*

"Applying the rule thus announced in the two Colorado cases above cited [*People v. Hoag*, and *Miller v. Ouray*, supra], it necessarily follows that since the duty the defendants are charged with violating or having violated is a duty to the public, the plaintiff cannot maintain an action against them on his own behalf.

\* \* \*

"*It would be inconsistent to relieve counties from liability and yet hold the officers liable.* * * *." (Precisely what the majority opinion does.) (Emphasis supplied.)

In *Miller v. Ouray*, supra, the Court of Appeals, in

pronouncing the rule of non-liability of county commissioners, stated:

" * * * If the contention of plaintiff be the law, then each individual commissioner would be liable in like actions to this, because of damages suffered by an individual by reason of alleged defects in a public highway or in a county bridge, or in any public building, or in the public grounds in which it might be situate. To so hold would tend in the large counties of the state, at least, to bring about, as was said by the supreme court of Idaho, 'the literal abrogation of the office of county commissioner, for no sane man would assume the position with such a liability attached.' — *Worden v. Witt, et al.*, 39 Pac. 1114.

"The duty imposed by the statute under consideration being with reference to the care, custody and supervision of public property, it would seem clear that the county commissioners as to the performance of that duty come within the class of public officers who are recognized by the authorities as subordinate governmental officers and administrative agents whose duty is owing primarily to the public collectively — to the body politic and not to any particular individual — who act for the public at large. — Mechem on Public Officers, §590, *et seq.;* Cooley on Torts, p. 442; Shearman and Redfield on Negligence, §302.

"This being true, a breach of the duty here charged will not support an individual action for damages against the commissioners. Mr. Cooley authoritatively lays down this doctrine, and it is supported by the great weight of authority, and so even in cases where a non-performance of the duty might prejudice an individual. This is held not to constitute a private wrong for which the injured party could have redress by individual action. — Cooley on Torts, 2d ed., p. 446, *et seq.;* Mechem on Public Officers, §§598, 599, 606; Shearman and Redfield, supra. The court did not err in sustaining the demurrer of the county commissioners."

The majority, in holding that the county commissioners might be held individually responsible in damages to private individuals for negligence in performing official duties may, as stated in *Miller v. Ouray*, and above quoted:

" * * * bring about * * * the literal abrogation of the office of county commissioner, for no sane man would assume the position with such a liability attached."

One week ago this court, in *City and County of Denver v. Madison*, supra, stated:

" * * * It is not within the province of the judicial branch of the government thus to change long established principles of law. * * *."

Thus the majority is in the anomalous position of paying homage to *stare decisis* in *Denver v. Madison* and decries upsetting the well established law of sovereign immunity, and now, in this case, the majority disregards *stare decisis* and overthrows well settled law holding that governmental officers are not liable, as set forth in *People v. Hoag*, supra; *Richardson v. Belknap*, supra, and *Miller v. Ouray*, supra.

The judgment of the trial court should be reversed in toto, with directions for further proceedings in conformity with the views herein expressed.

I am authorized to state that MR. JUSTICE FRANTZ concurs in this dissent.

MR. JUSTICE FRANTZ dissenting:

Mr. Justice Moore and Mr. Justice Doyle have one thing in common in their opinions: recognition of the doctrine of sovereign immunity. They diverge only on whether the doctrine should apply to this case. Their divergence arises solely from the views they entertain regarding the nature of county activity, and in particular the storage of dangerous explosives by the county. Each in his own way, however, in doing homage to sovereign immunity has submitted to a doctrine which

has only synthetic roots in our American common law.

I thought I had been accessory to the deliberate despatch of sovereign immunity. *Racing Commission v. Racing Association,* 136 Colo. 279, 316 P. (2d) 582; *Stone v. Currigan,* 138 Colo. 442, 334 P. (2d) 740. It now appears that what I considered death was only a coma, an apparent death, which the majority have resuscitated, to the extent at least that the doctrine is ambulatory in the field of torts.

I can never accede to the doctrine of immunity of government from suit or liability, or to its variant that the state or its branches are "immune from liability because the doctrine of respondeat superior [is] held to be inapplicable. This [is] a rudimentary survival of the maxim, 'The King can do no wrong.'" *Evans v. Berry,* 262 N.Y. 61, 186 N.E. 203, 89 A.L.R. 387. Such doctrine is as repugnant to me as a rule that would permit the government to take from its people with impunity. Refinement of the taking would not make the power less offensive to me.

That there is no historical foundation for the rule formed the basis of my dissent in the case of *Denver v. Madison,* 142 Colo. 1, 351 P. (2d) 826; that sovereign immunity is philosophically uncongenial to our concepts of government, and to the culture and temper of our people, forms the thesis of this opinion. Its adoption was tantamount to an ipse dixit of the court, and nothing more, since its acceptance as authority was made without understanding the doctrine's *raison d'etre.*

In showing that the doctrine is philosophically alien and foreign to the common genius of our people and their government, I mean nothing in disparagement of those of my brethren who disagree with me. But I do warn them that the names of those who espoused the doctrine should make it suspect.

"Bodin (1576) and Hobbes (1651) with Machiavelli (1513) are probably the fathers, though not without some earlier philosophical authority, of the modern no-

tion that the sovereign (king) is above the law, that sovereignty is 'the absolute and perpetual power of a commonwealth,' that the sovereignty is the 'supreme power over citizens and subjects unrestrained by the laws,' that the chief function of sovereignty was the creation of law and that *as the creator of law, the sovereign was not bound by the law.* Bodin did not conceive the State itself as sovereign, but only one element in it, the king. Law is the 'command of a sovereign using his sovereign power.'" (Emphasis supplied.) Borchard, Governmental Responsibility in Tort, 36 Yale L. J. 757, 785. See also Reinhardt, A Realistic Philosophy, 181. Hegel and Austin were later exponents of the doctrine.

There is a vast difference in the concepts of Blackstone and his 13th century prototype, the ecclesiastic and jurist, Bracton. "To Bracton the maxim 'the king can do no wrong' meant that the king was *not privileged to do wrong,* but to Blackstone the phrase was not so restricted, and in his Commentaries the following is to be found:

" 'Besides the attribute of sovereignty, the law also ascribes to the king in his political capacity absolute perfection. The king can do no wrong * * *

" 'The king, moreover, is not only incapable of doing wrong, but even of thinking wrong; he can never mean to do an improper thing: in him is no folly or weakness.'" Pugh, Historical Approach to the Doctrine of Sovereign Immunity, 13 La. L. Rev. 476, 479.

Today, statism is a rampant political philosophy. "What is statism? It is any form or structure of government which regiments the citizen and reduces him to the status of a ward of government, so that the citizen becomes a subject of his own government and ceases to be a free citizen." Holman, Must America Succumb to Statism, 35 A.B.A.J. 801. Today, the absolutism of the state in many countries is substituted for the absolutism of the monarch. And a facet of this philosophy is the

doctrine of immunity which is so incompatible with the genius of America and of Colorado. According to this doctrine, the state is not bound by the law of torts; it can commit no wrong; it is not liable, notwithstanding its servant has wrongfully injured a citizen.

Such philosophy is antithetical to the word and spirit of our federal and state constitutions. Our nation and our state are votaries of the philosophy of natural rights; they rejected the materialism of statism, and each and all of its particulars. Government is established by and for its people, whether it is the national or state government.

Men are endowed by their *"Creator with certain unalienable rights;* that among these are life, liberty, and the pursuit of happiness. That *to secure these rights, governments are instituted among men* * * * " These are familiar words of the Declaration of Independence. No person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use without just compensation." Fifth Amendment to the Federal Constitution. No state shall "deprive any person of life, liberty or property without due process of law * * * " Fourteenth Amendment to Federal Constitution.

This state was forbidden to form a government "repugnant to the constitution of the United States and the principles of the declaration of independence." Section 4, Enabling Act. Accordingly, several sections of Article II of the state constitution give unequivocal recognition to the natural rights of man. Note:

"In order to assert our rights, acknowledge our duties, and proclaim the principles upon which our government is founded, we declare:

\* \* \*

"Section 3. *All persons* have certain *natural, essential* and *inalienable rights,* among which may be reckoned the *right of enjoying and defending their lives* and liberties; of acquiring, possessing and protecting property;

and of *seeking* and *obtaining* *their* *safety* and happiness.

\* \* \*

"Section 6. Courts of justice shall be open to every person, and a speedy remedy afforded for *every* *injury* *to* *person,* property or character; and right and justice should be administered without sale, *denial* or delay.

\* \* \*

"Section 15. Private property shall not be taken or damaged, for public or private use, without just compensation.

\* \* \*

"Section 25. No person shall be deprived of life, liberty or property, without due process of law." (Emphasis supplied.)

The right to enjoy life is an inalienable right; and no court can render alienable by decision that which the constitution says is inalienable. The mandate of the constitution is that the courts afford a remedy for "every injury to person," not for "every injury to person, except those suffered by the tort of a servant of the state or of one of its governmental agencies."

It seems to me that by his very nature certain rights belong to man and that these rights are inalienable because they are inherent in the human being. These human rights outrank the claims and rights of the community or government. Why? Because the constitution proclaims that they are "natural, essential and inalienable." They existed and were his before he became a part of the family, the state and society. They are not bestowed upon him by the constitutions, federal and state, but are recognized as inhering in him and therefore are subject to the constitutional guarantees that they be and remain inviolable.

This is my conviction and the reasons for my original statement that I can never accede to the doctrine of sovereign immunity. Regardless of the passage of years in which this false doctrine has been recognized as a gospel of the law, when it becomes obvious through further

study that adherence to it is contrary to the fundamental purposes of our government and the fundamental documents under which our government operates, we should abandon and repudiate it. The Court never has the power to perpetuate error regarding the Constitution. We should do as was done in the case of *Hargrove v. Cocoa Beach* (Fla.), 96 So. (2d) 120, 60 A.L.R. (2d) 1193: put an end to a doctrine which should never have gained viability in this country.

MR. JUSTICE DOYLE dissenting:

Being of the opinion that the defense based upon sovereign immunity was not apparent from the facts set forth in the complaint so as to justify the trial court's dismissal of the action, I dissent from the views expressed in the majority opinion concerning sovereign immunity. However, I concur in the limited reversal. Even though the doctrine of sovereign immunity is repugnant to my personal viewpoint, I cannot assent to the concept of Mr. Justice Frantz that the entire doctrine is subject to judicial uprooting and destruction.

Noteworthy at the outset is the fact that a county now has a corporate existence and is subject to suit. C.R.S. '53, 36-1-1 (1). Although immunity from suit is not before us, the question being whether the county is immune from liability, this latter doctrine originates in the idea that the county cannot be sued.

The principle that a county enjoys full immunity from liability for personal injuries appears to be based upon the maxim that "The King can do no wrong." *Borchard, Governmental Responsibility in Tort,* 36 Yale L. J. 1, 39, provides a succinct explanation of the origins of the doctrine and shows that it is in fact a result of the concept of immunity from suit:

"Inasmuch as the English king was a personal ruler and the fountain of justice it was perhaps not unnatural that he should be regarded as exempt from the jurisdic-

tion of any court, except in the manner and to the extent that he consented to submit. It is said that this rule, which constituted a part of the common law, was introduced into the United States after American independence, notwithstanding that the sovereign here has from the beginning been separated from the government and that the latter has been deemed merely the agent of the sovereign. But in the early days of the nation the Supreme Court in *Chisholm v. Georgia* concluded that the doctrine of State immunity from suit was characteristic of autocracy and inconsistent with popular sovereignty. The eleventh amendment, however, though confined to the federal courts, restored the ancient doctrine to full effect, and the courts, since *Cohens v. Virginia,* have accepted it as immutable, regardless of its historical origin in an autocratic conception of a personal sovereign, of the diametrically opposed democratic theory of the American commonwealth and of the fact that a great part of the rest of the civilized world has denied its validity. Indeed it is regarded by our courts as a matter of simple logic, expressed as follows by Mr. Justice Holmes, an extreme Austinian:

" 'A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends.' And, comes the logical conclusion, as he is exempt from suit, therefore he can do no wrong. 'The United States has not consented to be sued for torts, and therefore it cannot be said that in a legal sense the United States has been guilty of a tort.' "

Since the county has the capacity to sue and to be sued, the historical reason for the rule (incapacity to sue and be sued) has disappeared. This incapacity was a major factor in the leading authority on county immunity, the decision of *Russell v. Devon County,* 2 TR 667, 100 Eng. Reprint, 359, 362 (1788), a case which is the universally recognized original authority for the

principle of unqualified immunity as applied to a county or a city. The decision finally turned on the fact that the defendants were sued as individuals and not as a legal entity — a corporation, and upon the further fact that even considering the county as a corporation, "there is no corporation fund out of which satisfaction is to be made." The Court further said:

"But the question here is, whether this body of men, who are used in the present action, are a corporation, or qua a corporation, against whom such an action can be maintained."

Undoubtedly the English Court was also disturbed over the lack of precedent for such liability. Notwithstanding its questionable legal basis, the case has come to be recognized as authority for the proposition that a county has an unqualified immunity from liability as well as from suit.

At the present time the county has a corporate character similar to that of a municipality and like the municipality has had to extend its activities beyond traditional governmental functions and consequently no reason is apparent for applying a full immunity to a county and a partial immunity to a city. When the county performs a function as an agency of the state, there is a reason for holding that immunity of the state should be available to it. Where, on the other hand, the county has not been commissioned by the state to perform a function on its behalf, and is acting in an independent non-governmental capacity, there is no justification in either history or logic for holding it to be immune from liability for tortious personal injuries.

The authoritative American case recognizing municipal immunity is *Bailey v. New York,* 3 Hill's Reports 531 (1842). This decision introduced the variation which has been since applied to municipalities — that the city is liable even though the act is authorized by statute if it is engaged in a private rather than a public endeavor. The distinction between functions proprietary and gov-

ernmental, and liability based upon the nature of the function, developed from the analysis of Chief Justice Nelson in that case. A tremendous body of confusing law has developed — differentiating between governmental and proprietary functions — and denying liability in the former but not in the latter. The accepted test is whether the city is engaged in the performance of functions on behalf of or as an agency of the state. See *Rhyne, Municipal Law,* 732:

" * * * No tort liability attaches with respect to the exercise of governmental functions because the city performs such functions under powers delegated by the state and under the same immunity enjoyed by the state. * * * "

Although current decisions recognize a limited or qualified immunity in a county similar to that recognized in the municipality, the early decisions applied the doctrine of full immunity to a county. One can only speculate as to the reason for this but it was possibly due to the limited scope of county activities as compared with the extensive activities of the municipality.

Thus in the case at bar, where the injury complained of was a consequence of storage by the county of dangerous explosives, there can be no possible basis in reason or tradition for denying a remedy to the person injured thereby on the ground that the county, in performing the acts complained of, is discharging duties imposed upon it by the state and is thus entitled to the protection of the state's immunity. The activity described in the complaint cannot, by any stretch of the imagination, be classified (at least at the county or state level) as governmental. A private person would, of course, be subjected to liability for injuries inflicted as a result of activity of the kind alleged. *Garden of the Gods Village v. Hellman,* 133 Colo. 286, 294 P. (2d) 597. This fact points up the injustice of the rule of complete county immunity.

In this day and age a county engages in many activi-

ties which are non-derivative and non-governmental. In so acting, it is logical and just that it be held responsible for injuries inflicted as a result of negligent conduct or ultra-hazardous activity. Neither the maxim "The King can do no wrong" nor present day policy considerations provide an acceptable justification for shielding it from liability beyond that to which a city is subjected.

The tendency to hold counties liable for injuries inflicted in connection with their non-governmental activities is a growing one. See the cases collected in 20 C.J.S. 1068, Sec. 215, *Counties,* under the following heading:

"On the other hand, a county, if amenable to suit, is liable for its torts when it is acting, not as a governmental agent, but as a private corporation, or in a proprietary capacity, or is performing special duties imposed on it with its consent, or voluntarily assumed by it, or when the tort amounts to an appropriation of property."

See also the numerous cases collected in the supplement to this section.

In 16 A.L.R. (2d) 1079 the author summarizes the present trend of the decisions by saying:

"Although the theory that counties, as subdivisions of the state, engage only in governmental functions still remains in some jurisdictions, the current trend of decisions supports the view that a county does in some cases exercise private or proprietary functions for which they may be liable in tort. In the following cases the court either recognized or applied the distinction between governmental and proprietary functions as affecting the liability of counties for torts arising out of the exercise of such functions. * * * "

See also *Harper and James,* Volume 2, Sec. 29.5, p. 1619. *The Restatement of the Law of Torts,* Sec. 887, declares:

"No one, except the State, has complete immunity from liability in tort."

Thus it seems clear that the immunity of the county

must be held to be qualified, and properly limited to governmental activity, although previous Colorado cases have not so limited it and have assumed that the immunity was complete. These decisions have been made, however, without reference to whether the activity involved was governmental, and so the question is really one of first impression here. The cases all seem to repeat that: "Even when a duty is imposed by statute, the county is not liable for failure to perform it, in the absence of express provisions creating such liability." See *County Commissioners of El Paso County v. Bish* (1893), 18 Colo. 474, 33 Pac. 184; *Board of Commissioners of Pitkin County v. Ball,* 22 Colo. 125, 43 Pac. 1000; *Town of Fairplay v. Board of Commissioners of Park County,* 29 Colo. 57, 67 Pac. 152; *County Commissioners v. Adler,* 69 Colo. 290, 194 Pac. 621; *Richardson v. Belknap,* 73 Colo. 52, 213 Pac. 335.

Although I agree with the opinion of Mr. Justice Frantz that the county should be held liable under the facts disclosed in this case, I disagree with his theory that we should judicially "repeal" the entire doctrine of sovereign immunity on the basis that it is unconstitutional or legally unsound, or upon the theory that it violates natural rights. The problem is entirely too complex to permit the kind of simple treatment proposed by his dissenting opinion.

There is the problem of whether the changeover should operate retrospectively. A holding that its operation is prospective in cases other than the decided cases would produce a highly unjust and illogical result. The Illinois Court discovered just how complex and deep rooted the problem is in *Molitor v. Kaneland Community Unit District No. 302,* 18 Ill. (2d) 11, 163 N.E. (2d) 89. The majority in that case ruled that this decision would have no retrospective effect except as to the particular claimant. The numerous other claimants who were injured in the same bus accident now contend that this constitutes an invalid discrimination. I agree with their

contention and undoubtedly the Court will be compelled to retreat from this part of its decision. It seems to me that the fact that the Illinois Court considered it necessary to apply the rule prospectively bolsters my contention that the abolition of the doctrine constitutes judicial legislation. Professor Borchard, the outstanding authority on, and the severest critic of, sovereign immunity, recognizes the high degree of complexity incident to any changeover and acknowledges that it is a legislative problem rather than a judicial one. See his articles in 20 Am. Bar Assn. Journal, 747; 34 Yale L. Journal 229. See also *Fuller and Casner, Municipal Tort Liability in Operation,* 54 Harv. L. Rev. 437, 460; *Pound, A Survey of Public Interests,* 58 Harv. L. Rev. 909; *Prosser on Torts,* 2d Ed. 774, 775; *Pound,* 13 *NACCA Law Journal* 25. In this latter article, the learned author sums up the problem as follows:

*"Judicial Compared with Legislative Changes.* Mr. Justice Holmes has told us that judicial lawmaking can be 'interstitial' only. By reasoned building upon judicial experience, by analogical application of past decision, by reasoning from established legal principles the courts will fill out gaps in the law and in deciding new cases by the application of old principles can keep abreast of the changes in social and economic conditions that are continual and inevitable in any but an exceptionally stagnant society. This, however, is as far as the courts can or ought to go. Radical and far-reaching changes, superseding of settled doctrines by wholly new starting points for judicial reasoning must be the task of legislation. Such things as providing for death by wrongful act, emancipating married women, workmen's compensation, extension of relief of debtors to farmers and working men, *and doing away with the immunities of sovereignty must by (sic) done by legislation.* The legislature may, if it chooses, do the work of interstitial lawmaking also. Moreover, the line is not sharply drawn and there is a zone in which both court and legislature

may appropriately act. But as a rule legislators are no longer willing to act except in the larger field. The time when legislatures could be relied upon for the minor, everyday tasks of keeping the law in a condition of maximum effectiveness for the administration of justice has gone by." (Emphasis supplied.)

Applying Dean Pound's distinction between interstitial and fundamental law changes to the present problem whether we are justified in holding a county liable for its non-governmental tortious conduct as against substituting an entirely new legal fabric by declaring the doctrine of immunity void, it seems clear that the modification which I suggest is valid. It involves mere reclassification and redefinition within the framework of our system.

The fact that the sovereignty rule is unjust or is violative of natural justice; or that it is historically unsound; or that it is contrary to the American tradition of protecting the dignity of the individual as against the state, does not justify a concurrence in the revolutionary change proposed in the dissent of my learned brother. The matter is so clearly legislative in character as to require careful survey, study and preparation. This kind of treatment cannot, as a practical matter, be provided by the courts.